NOVELL, INC., and Software
Spectrum, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant,

and

Lotus Development Corp. and
ASAP Software Express,
Inc., Intervenors.

No. 00–66C.

United States Court of Federal Claims.

May 8, 2000[1].

1. This opinion was issued under seal on April 28, 2000. Pursuant to ¶ 2 of the ordering language, the parties were requested to identify protected/privileged material subject to deletion. No deletions were requested.

David M. Nadler, Washington, DC, for plaintiffs. Charlotte Rothenberg Rosen and Michael J. Slattery, Dickstein Shapiro Morin & Oshinsky LLP, of counsel.

Wanda Rubianes–Collazo, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for defendant. Dinah Stevens, Administrative Office of the United States Courts, of counsel.

Thomas P. Humphrey, Washington, DC, for defendant-intervenors. John E. McCarthy Jr. and Jeffrey E. Greene, Crowell & Moring LLP, and Carl Hahn, IBM Corporation, of counsel.

## OPINION

MILLER, Judge.

This case is before the court after argument on defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) or, alternatively, for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4). Plaintiffs' bid protest challenges the Administrative Office of the United States Courts' award of a contract to replace the electronic mail system used by the federal courts. The issue to be decided is whether the Court of Federal Claims has jurisdiction under the Administrative Dispute Resolution Act of 1996 over the Administrative Office of the United States Courts, an entity outside of the executive branch of the Government. The court rules that jurisdiction does not lie to review a procurement undertaken by the Administrative Office of the United States Courts.

## FACTS

Novell, Inc., and Software Spectrum, Inc. ("plaintiffs"), are corporations that develop, manufacture, install, and support software and software systems for commercial and government customers. On February 8, 2000, plaintiffs filed this suit protesting the award of the Judiciary Electronic Mail Replacement program by the Administrative Office of the United States Courts (the "AOUSC") to the Lotus Development Corporation c/o ASAP Software Express, Inc. ("in-

tervenors"). The complaint alleges that the AOUSC conducted this procurement illegally by adding more than $10 million to plaintiffs' cost proposal and improperly downgrading plaintiffs' technical proposal. Plaintiffs seek a permanent injunction, an invalidation of the contract, and an order directing the AOUSC to award the contract to plaintiffs.

On March 20, 2000, plaintiffs moved to file a First Amended Complaint. The court granted the motion on April 7, 2000, to the limited extent that the amendments did not challenge the content of the solicitation specifications or the AOUSC's determination of its needs.

Defendant and intervenors[2] had moved to dismiss on March 10 and 9, 2000, respectively, and their motions apply with equal force to the amended complaint. Defendant contends that the AOUSC is not a federal agency under the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874–75 (1996) (codified at 28 U.S.C.A. § 1491 (West Supp.1999)) (the "ADRA" or the "1996 Tucker Act amendments"), and therefore is not within this court's bid protest jurisdiction. Defendant's motion further charges that 1) the complaint fails to state a claim upon which relief can be granted because the statute and regulations upon which plaintiffs ground their allegations are not applicable to the AOUSC; 2) Count IV fails to state a claim upon which relief can be granted because the AOUSC acted consistently with the terms of the solicitation in its technical evaluation of plaintiffs' proposal; and 3) Counts I, II, and III were not timely filed. Plaintiffs respond that 1) the court has jurisdiction over AOUSC procurements pursuant to the ADRA; 2) the statutes and regulations upon which the plaintiffs base their claim were adopted by the AOUSC for the purposes of this procurement; 3) Count IV, pleading that their technical proposal was improperly evaluated, states a valid cause of action; and 4) Counts I, II, and III were timely filed. Plaintiffs were given leave to file a surreply.

**2.** Intervenors' motion to dismiss for lack of subject matter jurisdiction or, alternatively, for failure to state a claim upon which relief can be granted, incorporates by reference the factual and legal arguments made in defendant's motion.

## DISCUSSION

1. *Standards for motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim*

When a federal court reviews the sufficiency of the complaint, whether on the ground of lack of subject matter jurisdiction or for failure to state a claim upon which relief can be granted, "its task is necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* To this end, the court must accept as true the facts alleged in the complaint, *see Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988), and must construe such facts in the light most favorable to the pleader. *See Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995) (holding courts obligated "to draw all reasonable inferences in plaintiff's favor"). It is well-settled doctrine that a complaint will not be dismissed for lack of subject matter jurisdiction or for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Therefore, when the facts alleged in the complaint reveal "any possible basis on which the nonmovant might prevail, the motion must be denied." *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed. Cir.1988) (citations omitted).

The burden of proving that the Court of Federal Claims has subject matter jurisdiction over a claim rests with the party seeking to invoke its jurisdiction. *See Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998). At the pleading stage, general factual allegations may suffice to meet this burden, for on a motion to dismiss the

For simplicity, the court uses "defendant" throughout this opinion to refer to the contentions of both defendant and intervenors, which are otherwise identical.

court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). However, because proper jurisdiction is not merely a pleading requirement, "but rather an indispensable part of the plaintiff's case, each element [of subject matter jurisdiction] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citing *National Wildlife Fed.*, 497 U.S. at 883–89, 110 S.Ct. 3177; *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 114 n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin*, 422 U.S. 490, 527 n. 6, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (Brennan, J., dissenting)). Therefore, as the parties invoking federal jurisdiction in the action, plaintiffs bear the burden of pleading the facts upon which the court's jurisdiction depends. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the court follows the accepted rule that a complaint should be dismissed only "where the plaintiff cannot assert a set of facts that supports its claim." *New Valley Corp. v. United States*, 119 F.3d 1576, 1579 (Fed.Cir.1997). The court must accept the factual allegations of the complaint as true, indulging all inferences in favor of plaintiff. *See W.R. Cooper*, 843 F.2d at 1364. A dismissal for failure to state a claim, unlike a dismissal for lack of subject matter jurisdiction, is a decision on the merits, calling for the court to focus on the allegations of the complaint. *See Gould, Inc. v. United States*, 67 F.3d 925, 929 (Fed.Cir.1995). Because granting such a motion terminates the case on its merits, the complaint must be construed broadly. *See Ponder v. United States*, 117 F.3d 549, 552–53 (Fed.Cir.1997). The claim should be dismissed only when no set of facts exists that would entitle plaintiffs to relief. *See Mostowy v. United States*, 966 F.2d 668, 672 (Fed.Cir.1992).

### 2. *The AOUSC*

The AOUSC is an arm of the judicial branch, performing administrative functions of the judiciary including: 1) administration of personnel matters; 2) examination of the state of court dockets and preparation of statistical data and reports (based on those dockets) on the type of transactions the courts address; 3) provision of a means through which information on improving the efficiency of the courts may be received; 4) disbursement of funds for maintenance of the courts; 5) procurement of equipment and supplies for the courts; and 6) preparation of budget estimates for the maintenance and operation of the courts and the AOUSC. *See* H.R. Rep. No. 702 (1939) (explaining Act of Aug. 7, 1939, ch. 15, § 302, 53 Stat. 1223, 1223 (codified at 28 U.S.C. §§ 601–604 (1994))); *see also* 28 U.S.C. § 604 (enumerating various duties of AOUSC Director's office). In fulfilling its role, the AOUSC operates "under the supervision and direction of the [Judicial Conference]." 28 U.S.C. § 604(d).

No other case disputes the characterization of the Ninth Circuit that the AOUSC "works directly for the federal judiciary," but "is not an Article III entity." *Tashima v. AOUSC*, 967 F.2d 1264, 1269 (9th Cir.1992). Despite its status as part of the judiciary, the AOUSC satisfies neither of the two fundamental attributes of Article III entities: life tenure and guaranteed salary. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 59, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The AOUSC is best understood as one of several "administrative agencies" closely associated with Article III courts that have been properly characterized as "non-Article III adjuncts." *Tashima*, 967 F.2d at 1269 (internal quotations omitted). The Supreme Court consistently has held that these bodies, "which lack the attributes of life tenure and guaranteed salary, no matter how closely associated with Article III entities they may be, are not Article III entities themselves." *Id.* (citing *Northern Pipeline*, 458 U.S. at 61, 102 S.Ct. 2858,

*United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), and *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932)).

"The [AOUSC] was created to perform, and historically has performed, a limited ministerial function. It was not intended to govern or make policy for the Judiciary.... The [AOUSC's] role was intended to be administrative in the narrowest sense of that term." *Tashima,* 967 F.2d at 1271 (internal quotations omitted). While recognizing the critical role the AOUSC performs, the courts zealously have protected their judicial functions from encroachments that threaten judicial independence, including those by non-Article III adjuncts. *See Northern Pipeline,* 458 U.S. at 84, 102 S.Ct. 2858. Motivated by separation of powers concerns, non-Article III adjuncts are not allowed to engage in judicial policymaking or exert influence over the performance of judicial functions. *See Tashima,* 967 F.2d at 1269–70. Thus, the AOUSC "was entrusted with no authority over the performance of judicial business." *Chandler v. Judicial Council of the Tenth Circuit,* 398 U.S. 74, 97, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970) (Harlan, J., concurring).

### 3. *The Tucker Act amendments*

Defendant argues that plaintiffs' complaint must be dismissed for lack of subject matter jurisdiction because it does not fall within the scope of this court's bid protest jurisdiction under the 1996 Tucker Act amendments. *See* 28 U.S.C.A. § 1491(b)(1) (West Supp. 1999). According to defendant, the term "Federal agency," as used in that statute, encompasses only entities within the executive branch and therefore excludes the AOUSC. Plaintiffs dispute this claim, citing cases interpreting the statute's jurisdictional grant more broadly. The question whether the AOUSC is a "Federal agency" within the meaning of the 1996 Tucker Act amendments appears to be one of first impression.

■ The Tucker Act is the primary statute defining the United States' waiver of sovereign immunity as it relates to the Court of Federal Claims. The Tucker Act gives the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C.A. § 1491(a)(1). The Tucker Act, itself, does not create any causes of action against the United States. *See United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Instead, to invoke jurisdiction under the Tucker Act, a plaintiff must identify a contractual relationship, a constitutional provision, a statute, or a regulation that provides a substantive right to money damages. *See Hamlet v. United States,* 63 F.3d 1097, 1101 (Fed.Cir.1995), cert. denied, 517 U.S. 1155, 116 S.Ct. 1542, 134 L.Ed.2d 646 (1996).

Previously, disappointed bidders could only challenge alleged improprieties in the procurement process in this court before the contract award. *See Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 (Fed.Cir. 1998). However, in 1996, with the passage of the ADRA, Congress amended the Tucker Act in order to give the Court of Federal Claims jurisdiction to consider pre- and post-award bid protests. *See* 28 U.S.C.A. § 1491(b)(1)-(4). The Federal Circuit has construed section 1491(b) as the jurisdictional grant upon which all protests actions are predicated in the Court of Federal Claims. *See Ramcor Servs. Group v. United States,* 185 F.3d 1286, 1290 (Fed.Cir.1999).

The Tucker Act, as amended by the ADRA, provides as follows:

Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation *by a Federal agency* for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action with-

out regard to whether suit is instituted before or after the contract is awarded. § 1491(b)(1) (emphasis added). The dispute in this case is focused primarily on the meaning of the term "Federal agency," a term that the statute does not define.[3]

 Jurisdictional statutes are to be construed narrowly and " 'with precision and with fidelity to the terms by which Congress has expressed its wishes.' " *Bailey v. West,* 160 F.3d 1360, 1363 (Fed.Cir.1998) (quoting *Cheng Fan Kwok v. INS,* 392 U.S. 206, 212, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968)); *see Livingston v. Derwinski,* 959 F.2d 224, 225 (Fed.Cir.1992) (stating jurisdictional statutes are to be limited strictly to subjects contained within statutory mandate). Ambiguities with regard to jurisdiction should be "resolved against the assumption of jurisdiction." *Mars Inc. v. Kabushiki–Kaisha Nippon Conlux,* 24 F.3d 1368, 1373 (Fed.Cir. 1994) (citation omitted). Although jurisdiction may be broadened through legislation, the "waiver of immunity and the creation of jurisdiction must be qualified by any conditions that Congress has placed on them." *Bailey,* 160 F.3d at 1363 (citations omitted); *see, e.g., SMS Data Prods. Group, Inc. v. United States,* 853 F.2d 1547, 1555 n. * (Fed. Cir.1988) (discussing amendments that expanded jurisdiction). Only through an express waiver of sovereign immunity will the Government be subject to claims against it. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Testan,* 424 U.S. at 398–99, 96 S.Ct. 948; *James M. Ellett Constr. Co. v. United States,* 93 F.3d 1537, 1541 (Fed.Cir.1996); *Anderson Columbia Envtl., Inc. v. United States,* 42 Fed.Cl. 880, 885 (1999) (noting intervention of non-interested parties in bid protest actions would violate "principle that waivers of

immunity must be narrowly construed"). Under the Tucker Act, it is solely plaintiff's burden to prove the jurisdiction of the Court of Federal Claims. *See Alder Terrace,* 161 F.3d at 1377.[4] Guided by these cardinal principles, the court assesses the jurisdictional limits of the Tucker Act.

### 4. *The Supreme Court's rulings construing the term "agency"*

In *Hewlett–Packard Co. v. United States,* 41 Fed.Cl. 99 (1998), the Court of Federal Claims was asked to determine whether the United States Postal Service was a "Federal agency" and therefore subject to jurisdiction under the 1996 Tucker Act amendments. Holding that the plain meaning of the term included the Postal Service for purposes of the ADRA, the court concluded that the meaning of "Federal agency," as used in 28 U.S.C.A. § 1491(b)(1), was coextensive with the meaning of "agency" as defined by 28 U.S.C. § 451 (1994). *See Hewlett–Packard,* 41 Fed.Cl. at 103.[5] That statute provides:

As used in this title:

. . . .

The term "agency" includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, *unless the context shows that such term was intended to be used in a more limited sense.*

(Emphasis added.)

Defendant argues that the statutory context of section 451 operates to exclude the entire judicial branch, including the AOUSC. Defendant relies on *Hubbard v. United States,* 514 U.S. 695, 115 S.Ct. 1754, 131

---

3. Title 28, however, does define the unmodified term "agency." *See* 28 U.S.C. § 451 (1994); *Hewlett–Packard Co. v. United States,* 41 Fed.Cl. 99, 103 (1998).

4. Despite the universal acceptance of this proposition, *Butz Engineering Corp. v. United States,* 204 Ct.Cl. 561, 499 F.2d 619 (1974), appears to attempt to shift this burden. Ruling that the United States Court of Claims had jurisdiction over plaintiff's suit against the United States Postal Service for breach of contract, the court stated: "[W]here the agency whose operations

are in dispute concededly functions as an instrumentality of the Federal Government, the burden is on defendant to demonstrate that this court is without jurisdiction to hear the claim." *Id.* at 565, 499 F.2d at 622 (footnote omitted). By all accounts, this view is against the great weight of authority. *See, e.g., McNutt,* 298 U.S. at 189, 56 S.Ct. 780; *Reynolds,* 846 F.2d at 748. Significantly, the circumstances giving rise to that case are distinguishable from those at bar.

5. For the reasons explained *infra* at pp. 611–614, the court does not follow this analysis.

L.Ed.2d 779 (1995). In *Hubbard* the petitioner was indicted for filing false papers in bankruptcy court under 18 U.S.C. § 1001 (1994). 18 U.S.C. § 1001 criminalizes false statements and similar misconduct occurring "in any matter within the jurisdiction of any department or agency of the United States." The Court's decision was based on an analysis of 18 U.S.C. § 6, which defines "agency" as it is used in 18 U.S.C. § 1001. In holding that a bankruptcy court was not an "agency" within the meaning of 18 U.S.C. § 1001, the Supreme Court stated that "it seems incontrovertible that 'agency' does not refer to a court." *Hubbard*, 514 U.S. at 700, 115 S.Ct. 1754 (footnote omitted).

Because 18 U.S.C. § 6 is identical to 28 U.S.C. § 451, and because the parties agree that the legislative history of section 451 supports relying on 18 U.S.C. § 6 (1994), in determining the meaning of "agency" in section 451, the provision at issue in this case, defendant argues that the Court's analysis in *Hubbard* is binding. Defendant's first contention with respect to *Hubbard* is that this passage mandates the exception of the entire judicial branch from the definition of "agency." Because the AOUSC is not an "agency" within the meaning of 18 U.S.C. § 6, and so correspondingly 28 U.S.C. § 451, the AOUSC, the argument goes, is exempted from the 1996 Tucker Act amendments.

Defendant urges that the court adopt the definition of "agency" from a criminal statute that the Supreme Court in *Hubbard* described as directed to "the proliferation of fraud in the newly formed Executive agencies." 514 U.S. at 707, 115 S.Ct. 1754.

We have repeatedly recognized that the 1934 Act was passed at the behest of "the Secretary of the Interior to aid the enforcement of laws relating to the functions of the Department of the Interior and, in particular, to the enforcement of regulations ... with respect to the transportation of 'hot oil.'" *United States v. Gilliland*, 312 U.S. 86, 93–94, 61 S.Ct. 518, 85 L.Ed. 598 (1941); *see also United States v. Yermian*, 468 U.S. 63, 72, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984) (the 1934 Act was "needed to increase the protection of federal agencies from the variety of deceptive practices plaguing the New Deal administration"); *id.*, at 80, 104 S.Ct. 2936 (Rehnquist, J., dissenting) (the statute was prompted by problems arising from "the advent of the New Deal programs in the 1930's")....

....

None of our opinions refers to any indication that Congress even *considered* whether the 1934 Act might apply outside the Executive Branch, much less that it affirmatively understood the new enactment to create broad liability for falsehoods in the federal courts. In light of this vacuum, it would be curious indeed if Congress truly intended the 1934 Act to work a dramatic alteration in the law governing misconduct in the court system or the Legislature ....

*Id.* at 707, 115 S.Ct. 1754. The parties have not presented legislative history for the Tucker Act amendments which might suggest a similarly limited purpose.

18 U.S.C. § 6, like 28 U.S.C. § 451, prescribes an inclusive interpretation of the term "agency," "unless the context shows that such term was intended to be used in a more limited sense." The context that the court considered in the *Hubbard* decision was an effort by Congress, through 18 U.S.C. § 1001, to criminalize false statements to newly created agencies of the United States. Thus, according to the Supreme Court, the context of the term showed that it was intended to be used in a limited sense. The context in *Hubbard*—the genesis of the statement "that 'agency' does not refer to a court"—is different from the procurement process at issue in this case.

Defendant musters woefully little support for the proposition that the term "court" is broad enough to include the AOUSC. While admittedly a bankruptcy court lacks Article III judicial powers, it is a court nonetheless. In contrast, Congress has defined the AOUSC as an entity distinct from "a court." 5 U.S.C. § 5721(1) (1994), a federal compensation statute, for example, distinguishes a court of the United States from the AOUSC:

[A]gency means-

 (A) an Executive agency;

(B) a military department;

(C) a court of the United States;

(D) the Administrative Office of the United States Courts;

(E) the Library of Congress;

(F) the Botanic Garden;

(G) the Government Printing Office; and

(H) the government of the District of Columbia;

but does not include a Government controlled corporation. . . .

More significant still, defendant's proffer that *Hubbard* is determinative neglects explicit language conditioning the pronouncement that "it seems incontrovertible that 'agency' does not refer to a court." The Supreme Court stated, in the accompanying footnote: "We express no opinion as to whether any other entity within the Judicial Branch might be an 'agency' within the meaning of [18 U.S.C.] § 6." *Hubbard,* 514 U.S. at 700 n. 3, 115 S.Ct. 1754.

Defendant alternatively contends that *Hubbard* controls this case because the Court rejected the so-called "judicial function" exception. The *Hubbard* decision overruled *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955), which dealt with that same statute criminalizing false statements before agencies of the United States. *See Hubbard,* 514 U.S. at 715, 115 S.Ct. 1754. The Court in *Bramblett* interpreted the terms "department or agency," as defined in 18 U.S.C. § 6, to include "the executive, legislative and judicial branches of the Government." *Bramblett,* 348 U.S. at 509, 75 S.Ct. 504. In rejecting this broad reading, the Court in *Hubbard* also considered the "judicial function" exception. Under the "judicial function" exception, first suggested in *Morgan v. United States,* 309 F.2d 234 (D.C.Cir.1962),

*cert. denied,* 373 U.S. 917, 83 S.Ct. 1306, 10 L.Ed.2d 416 (1963), "only those misrepresentations falling within a court's 'administrative' or 'housekeeping' functions can give rise to liability under § 1001, [whereas] false statements made while a court is performing adjudicative functions are not covered." *Hubbard,* 514 U.S. at 698–99, 115 S.Ct. 1754. Although the Court in *Hubbard* acknowledged that a "straightforward interpretation" of the term "agency," as used in 18 U.S.C. § 1001, would "lead inexorably to the conclusion" that the reach of the statute did not extend to courts, it was compelled to consider the fate of the "judicial function" exception because of the Court's broad interpretation in *Bramblett.* *Hubbard,* 514 U.S. at 701, 115 S.Ct. 1754.

Defendant asserts, in this regard, that the *Hubbard* Court's overruling of *Bramblett* eliminated the "judicial function" exception. Without the "judicial function" exception, defendant sees no justification for differentiating between the administrative functions of the judiciary, which may be performed by various entities within the judicial branch like the AOUSC, and the adjudicative functions of the judiciary, which are the exclusive province of Article III courts. This court is unable to find support for defendant's proposition in the *Hubbard* opinion, and, as noted, the Supreme Court expressly left the question open. *See Hubbard,* 514 U.S. at 700 n. 3, 115 S.Ct. 1754.[6] Accordingly, defendant's proffer with respect to the "judicial function" exception is unavailing.

Defendant also relies on *Hubbard* because it allegedly has generated rock-solid progeny. According to defendant, all of the decisions following *Hubbard* stand for the proposition that "entities performing administrative functions similar to those performed by the AOUSC do *not* fall under the definition of 'agency.'" Def's Br. filed Apr. 7, 2000, at 6.

---

**6.** Justice Stevens, author of the *Hubbard* opinion, confirmed the continued viability of the "judicial function" exception in no uncertain terms—albeit in a section supported by two other justices and not joined in by the majority.

Although the judicial function exception has not been adopted by this Court, our review of *Bramblett* supports the conclusion that the cases endorsing the exception almost certainly

reflect the intent of Congress. It is thus fair to characterize the judicial function exception as a 'competing legal doctrin[e]' that can lay a legitimate claim to respect as a settled body of law. Overruling *Bramblett* would preserve the essence of this doctrine and would, to that extent, promote stability in the law.

*Hubbard,* 514 U.S. at 713, 115 S.Ct. 1754 (Stevens, J.) (footnote and citation omitted).

Examination of these cases reveals overstatement. *United States v. Rostenkowski,* 1996 WL 342110 (D.D.C. Mar. 12, 1996), which is an unpublished opinion, held that, for purposes of 18 U.S.C. § 6, the Federal Election Commission is an "agency," while the House Finance Office is not; rather, the latter is a "congressional entity." *Id.* at *4. Ironically, but sadly not an infrequent litigation tactic, the United States in that case argued for a broad reading of 18 U.S.C. § 6 and an interpretation of "agency" that mirrors plaintiffs' position in this case. Opportunistic legal arguments aside, significant to the district court's ruling in *Rostenkowski* that *Hubbard* commanded such a reading was the following: "In Hubbard, the Supreme Court discussed the history of the 1934 Act, which created what is now § 1001. The court concluded that Congress intended the statute to criminalize the proliferation of fraud in the newly formed New Deal Executive agencies. Hubbard[, 514 U.S. at 707, 115 S.Ct. at 1761]." 1996 WL 342110 at *3. The district court then quoted the language from *Hubbard* that appears *supra* at p. 607. Thus, the unpublished *Rostenkowski* opinion is consistent with the limited application of *Hubbard* to the statute before the Supreme Court.

The next case, *United States v. Dean,* 55 F.3d 640 (D.C.Cir.1995), is cited by defendant for the holding that a Senate committee was not a department or agency under *Hubbard.* Again, the United States advanced an inclusive reading of 18 U.S.C. § 1001. The court held that the committee was not a "department" within the executive branch, and its discussion was summary. *See id.* at 658–59. *United States v. Oakar,* 111 F.3d 146 (D.C.Cir.1997), is cited as concluding that the House Clerk is not a "department or agency." *See id.* at 153. *Oakar* held that the House Ethics Committee, an entity within the Legislative Branch, cannot be a "department" within the contemplation of 18 U.S.C. § 1001, as interpreted in *Hubbard. See Oakar,* 111 F.3d at 153. Defendant did not prevail on its argument for broader inclusion in that case either. Defendant apparently copied the footnote in *United States v. Brooks,* 945 F.Supp. 830, 832 n. 4 (E.D.Pa. 1996), quoting the unpublished decision in *United States v. Levine,* 72 F.3d 920 (D.C.Cir.1995) (table), a case construing 18 U.S.C. § 1001 as applying to false claims made to the executive branch alone. For its part *Brooks,* rejecting the United States' argument that the Copyright Office is an "agency" under 18 U.S.C. § 1001, lists all the cases decided to its date, correctly distilling them as holding that they have "refused to allow § 1001 prosecutions for false statements to the legislative or judicial branches." 945 F.Supp. at 832.

Finally, *United States v. Hansen,* 906 F.Supp. 688 (D.D.C.1995), discussed another argument by the United States that supported a broad construction of "agency" under 18 U.S.C. § 1001 with the argument that the *Hubbard* Court's reasoning was based on the narrow statutory definition of "department." The *Hansen* court used the metaphor of a shelter having "a weak foundation and a leaky roof" to dispose of the United States' argument that the House of Representatives is an "agency." *Id.* at 695. The court went on to add, by way of *dicta:* "While the Supreme Court may have left some room to maneuver regarding whether the administrative offices of Congress and the Judiciary are agencies within the meaning of 18 U.S.C. § 1001, there is no doubt that the House of Representatives itself is beyond the grasp of the statute...." *Id.* at 695.

In sum, and not surprisingly, all the cases following *Hubbard* deal with permutations of the executive and legislative branches of the Government in the context of 18 U.S.C. § 1001 and the applicable definition found in 18 U.S.C. § 6. They are consistent insofar as they follow the narrow prescription of *Hubbard* in the identical context in which *Hubbard* arose.[7] They differ with the case at bar in two major respects: 1) The statute requiring the term "agency" to be defined, 18

7. Following *Hubbard* Congress amended 18 U.S.C. § 1001 to cover false statements made "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." 18 U.S.C. § 1001(a), *as amended by* False Statements Accountability Act of 1996, Pub.L. No. 104–292, § 2, 110 Stat. 3459.

U.S.C. § 1001, is not the statute, or even similar to the statute, in this case, 28 U.S.C.A. § 1491(b)(1); and 2) the United States in the cited cases argued for a broad reading of 18 U.S.C. § 6, whereas in this case it takes the opposite view. Although 18 U.S.C. § 6 is helpful in interpreting "agency" for purposes of 28 U.S.C. § 451, the *Hubbard* line of cases ties section 6 so closely to the purpose of section 1001 that these decisions cannot be determinative in this case.

### 5. *The Tucker Act and the Administrative Procedure Act*

Defendant contends that in undertaking to define "Federal agency," and thereby to assess the jurisdictional limitations of the Tucker Act, the court must, contrary to the approach outlined in *Hewlett–Packard,* go beyond 28 U.S.C. § 451 and refer to the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1994) (the "APA"). Bid protests brought before the Court of Federal Claims under the Tucker Act must be reviewed under the standards prescribed by the APA in 5 U.S.C. § 706. *See* 28 U.S.C.A. § 1491(b)(4); *Ramcor,* 185 F.3d at 1290. *See generally Keco Indus. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974). Therefore, in determining whether a disappointed contractor is entitled to relief, defendant advances the argument that the jurisdictional limits articulated by the APA are controlling. However, that the Tucker Act borrows the APA review standard does not signify that the jurisdictional limits of the statutes are coextensive. The court has found no precedent to support such a view.

Plaintiffs cite *Hewlett–Packard,* a decision rejecting defendant's argument that interpretation of statutes and regulations beyond title

28 was necessary to define the term "Federal agency." Instead, the court held that, "[u]nder the circumstances, the court concludes that the use of the term 'Federal agency' in the Tucker Act amounts to a redundancy," and that its meaning was coextensive with the term "agency" as used in 28 U.S.C. § 451. *Hewlett–Packard,* 41 Fed.Cl. at 103 (citations omitted). Defendant counters that application of the ADRA to the AOUSC would have the anomalous result of subjecting AOUSC procurement activities to APA review, even though its other activities are not. The argument that the statutory scheme mandates use of APA definitions (as opposed to review standards) is extraneous because the interpretation of the term "Federal agency" can be resolved within the framework of 28 U.S.C.A. § 1491(b)(1) and 28 U.S.C. § 451.[8]

Assuming that the APA controls, defendant contends that the AOUSC is clearly excluded from the 1996 Tucker Act amendments. The APA's definition section states:

(b) For the purpose of this chapter—

(1) 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, *but does not include—*

. . . .

(B) the courts of the United States

. . . .

5 U.S.C. § 701(b)(1) (emphasis added). Defendant urges the court to interpret the term "court" broadly to exclude from the APA the entire judicial branch, including the AOUSC. In support of this argument, defendant offers the lower court opinion in *Tashima v. AOUSC,* 719 F.Supp. 881 (C.D.Cal.1989),

---

**8.** Defendant also contends that the ADRA extended the bid protest jurisdiction of the Court of Federal Claims so that it could provide relief in post-award cases as previously provided by the district court under the *Scanwell* doctrine. *See Scanwell Lab. v. Shaffer,* 424 F.2d 859 (D.C.Cir. 1970). Under the *Scanwell* doctrine, federal district courts were authorized to review agency procurement decisions pursuant to the APA which exclude "courts" from the definition of "agency." The proposition that the ADRA did not expand the scope of this court's bid protest jurisdiction beyond that previously exercised under *Scanwell,* however, was rejected in *Ramcor.*

*See* 185 F.3d at 1289 (noting the "very sweeping" scope of the ADRA). Based on the same *Scanwell* argument that defendant now advances, the trial court ruled that a challenge based on violation of a procurement regulation must arise in the context of a bid protest. Defendant in this case did not cite or distinguish *Ramcor,* which deprived plaintiffs of the opportunity to respond to an important argument. In these circumstances the court cannot consider defendant's argument at this time. *See Ramcor Servs. Group v. United States,* 41 Fed.Cl. 264, 268–69 (1998), *vacated in part and aff'd. in part,* 185 F.3d 1286 (Fed.Cir.1999).

*aff'd on other grounds,* 967 F.2d 1264 (9th Cir.1992). In *Tashima* a district court judge argued that the AOUSC's refusal to reimburse him for the expense of hiring private counsel to defend him was arbitrary, capricious, and an abuse of discretion under the APA. Relying on *Lifetime Communities, Inc. v. AOUSC, (In re Fidelity Mortgage Investors* ), 690 F.2d 35, 38 (2d Cir.1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983), for the proposition that "it is clear that Congress intended the entire judicial branch of the Government to be excluded from the provisions of the [APA]," the court reasoned that the AOUSC was not an "agency" within the meaning of the APA and therefore not subject to its requirements. *Tashima,* 719 F.Supp. at 886 (internal quotations omitted).

The first problem with defendant's reliance on *Tashima* is that defendant cited, but did not discuss, the Ninth Circuit's opinion. The appeals court did not base its decision on the APA or even cite to it in affirming the lower court's decision on jurisdiction. *See Tashima,* 967 F.2d at 1272 (construing 28 U.S.C. § 463 as not empowering the AOUSC to pick and choose which federal judges sued in their legal capacity will be represented at government expense). The second problem with defendant's reliance on *Tashima* is that *Lifetime Communities* stands for a less ambitious proposition than that advanced by defendant. In *Lifetime Communities,* the court considered the applicability of the APA to the Judicial Conference. In holding that the Judicial Conference was a "court" within the meaning of the APA, the Second Circuit's analysis relied on several factors—none of which applies to the AOUSC. The court noted that the Judicial Conference is made up entirely of judges with life tenure and guaranteed salaries. The court also pointed out that the Judicial Conference had a "well-established and well-known practice" for rule-making that had never followed APA provisions. *Lifetime Communities,* 690 F.2d at 38. It was significant, then, that Congress had recently reinvested the Judicial Conference with this power to set fees "without mandating any changes in the Conference's method of procedure." *Id.* Finally, the court examined the annual reports of the Conference to demonstrate "how integrated its functions are with those of the courts." *Id.* at 39. Among the issues the Second Circuit considered was whether the disposition of court records and judicial ethics were tasks that otherwise might have been performed by courts. No aspect of this analysis holds true for the AOUSC. As the Second Circuit itself admitted in *Lifetime Communities,* "[t]he word 'court' like any other word, 'may vary greatly in color and content according to the circumstances and the time in which it is used.' " *Id.* at 38 (quoting *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918)).

*Goldhaber v. Foley,* 519 F.Supp. 466 (E.D.Pa.1981), dealt with the issue squarely. In contrast with *Tashima*—which did not involve a procurement—and *Lifetime Communities*—which also was not a procurement case and did not concern the AOUSC—the court in *Goldhaber* considered a challenge to an AOUSC procurement. Defendant argued, as in this case, that the AOUSC was exempt from judicial review under the APA. The court disagreed, holding that although the AOUSC is certainly an arm of the courts, it did not fit within the APA exemption for "the courts of the United States." The court deemed "it significant, in this regard, that the functions of the [AOUSC] are much more akin to those of an administrative or executive agency than to those of the courts." *Id.* at 480. Most notably, the AOUSC does not engage in judicial policymaking. "In light of this, we cannot conclude that Congress intended to exclude the [AOUSC] from the extraordinarily broad ambit of the APA." *Id.* at 481 (citation omitted). Although *Goldhaber* is not an appellate decision and bears some age and no progeny, this court relies on it as an accurate characterization of the AOUSC's functions in contrast to those of the courts, as well as its role in the judicial branch.

The Ninth Circuit in *Tashima* characterized the AOUSC in much the same manner as *Goldhaber. See Tashima,* 967 F.2d at 1269–70, *see also supra* p. 604. The court explained that the AOUSC, which "is not an Article III entity," "was created to perform, and historically has performed, a limited min-

isterial function. It was not intended to govern or make policy for the Judiciary.... The [AOUSC's] role was intended to be administrative in the narrowest sense of that term." *Tashima*, 967 F.2d at 1269, 1271 (internal quotations omitted).

The Ninth Circuit's analysis in *Tashima* helps to reconcile *Goldhaber*, holding that the AOUSC is covered by the APA, with *Lifetime Communities*, holding that the Judicial Conference is not. Historically, the AOUSC has performed a strictly limited administrative function. *See Tashima*, 967 F.2d at 1271. Because it lacks the two fundamental attributes of life tenure and guaranteed salary, the AOUSC is not an Article III entity. *See id.* at 1269. For these reasons the AOUSC has never, and could never, be entrusted with authority over the performance of the judicial functions reserved for Article III entities. In contrast, the Judicial Conference, discussed in *Lifetime Communities*, is an Article III entity. *See* 690 F.2d at 38–39; *see also* 28 U.S.C. § 331 (1994). It is exclusively composed of Article III judges. The Judicial Conference historically has performed a judicial policymaking function. Thus, although not discussing the APA, *Tashima* offers an assessment of the AOUSC's functions that lends support to the distinction between non-Article III adjuncts, like the AOUSC, which fall outside the APA's jurisdictional prohibition, and the Judicial Conference and other Article III entities, which do not.

### 6. *Other procurement statutes*

Defendant grounds a compelling argument on other procurement statutes. At least three of these statutes define the term "Federal agency," as follows: "(b) The term 'Federal agency' means any executive agency or any establishment in the legislative or judicial branch of the Government (except the Senate, the House of Representatives, and the Architect of the Capitol and any activities under his direction)." 40 U.S.C. § 472(b) (1994).[9] Defendant concedes that this definition encompasses the AOUSC. The Federal

Property and Administrative Services Act of 1949, 40 U.S.C. §§ 471–544 (1994), contains the above-quoted definitional section to which reference is made in two other procurement-related statutes that cover a "Federal agency." The older is the statute that authorizes the Comptroller General to decide bid protests against a "Federal agency." 31 U.S.C. § 3553 (1994). The General Accounting Office (the "GAO"), the Comptroller General's designee, derives its jurisdiction from this statute. 31 U.S.C. § 3551(3) provides: "The term 'Federal agency' has the meaning given such term by section 3 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. [§ ]472)."

More recently, indeed eight months preceding enactment of the ADRA, Congress amended Title 41, entitled Public Contracts, to include the Procurement Integrity Act, 41 U.S.C.A. §§ 401–436 (West Supp.1999), which also imports the definition of "Federal agency" from 40 U.S.C. § 472(b). *See* National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104–106, 110 Stat. 186, § 4304(f)(3) (1996) (codified at 41 U.S.C.A. § 423(f)(3)).

These statutes, defendant argues, show that Congress has defined the term "Federal agency" to include establishments within the judicial branch. That Congress used the definition of "agency" in 28 U.S.C. § 451 demonstrates an intent to include only the listed "department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest," especially because the next clause reads, "unless the context shows that such term was intended to be used in a more limited sense."

The court in *Hewlett–Packard* was not troubled by the nuance that 28 U.S.C.A. § 1491(b) uses "Federal agency," as opposed to "agency," concluding that "use of the term 'Federal agency' in the [1996] Tucker Act [amendments] amounts to a redundancy." 41 Fed.Cl. at 103. Although this court agrees with the *Hewlett–Packard* analysis

9. 40 U.S.C. § 472(a) defines "executive agency," as follows: "The term 'executive agency' means any executive department or independent estab-

lishment in the executive branch of the Government, including any wholly owned Government corporation."

that 28 U.S.C.A. § 1491(b) is the source of the court's bid protest jurisdiction and that the definition in 28 U.S.C. § 451 is the applicable definitional provision, it respectfully disagrees that "Federal" is a redundancy. The three other procurement statutes are evidence that Congress has defined the term "Federal agency" to have a special meaning.

■ "It is 'a normal rule of statutory construction' ... that 'identical words used in different parts of the same statute are intended to have the same meaning.' " *Commissioner v. Keystone Consol. Indus., Inc.,* 508 U.S. 152, 159, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993) (quoted in *CUNA Mut. Life Ins. Co. v. United States,* 169 F.3d 737, 741 (Fed.Cir.1999)). Here, the terms "Federal agency" and "agency" are not identical, and they appear in the same Title, but not in the same statute. Nothing in the legislative history of the ADRA illuminates why Congress, within an eight-month period, defined "Federal agency" differently in two statutes relating to bid protests.[10] Defendant offers as an explanation a quotidian diminishment of the court's jurisdiction:

> Even though AOUSC is not subject to the Court's protest jurisdiction, it remains subject to GAO protest jurisdiction. Therefore, AOUSC procurements will continue to be reviewable by an expert protest tribunal. Unlike the Court of Federal Claims, Congress has expressly granted the GAO protest jurisdiction over the judiciary. 31 U.S.C. § 3551; 40 U.S.C. § 472(b). As a part of the legislative branch, the GAO is wholly independent of the judiciary, and may be a more appropriate bid protest forum for that reason.

10. 41 U.S.C. § 423(g), for example, discusses bid protests to the GAO.

11. The court in *Hewlett–Packard* stated:
The legislative history of the ADRA clearly shows an intent to broaden this court's jurisdiction and to make that jurisdiction coequal with the district courts. See H.R. Conf. Rep. No. 104–841, at ___ (1996), 142 Cong. Rec. H11108–05, H11111 (daily ed. Sept. 25, 1996) (ADRA intended to "give the Court of Federal Claims exclusive jurisdiction over the full range of procurement protest cases previously subject to review in the federal district courts

Def's Br. filed Apr. 7, 2000, at 15 n. 7. Clairvoyance and speculation are not tools of statutory construction.

■ If the court were to borrow the definition of "Federal agency" from the three procurement statutes in other Titles of the United States Code, the court would be ignoring the applicable definitional provision—section 451. The court must accept the ADRA amendments as enacted; they provide no definition of "Federal agency" as "agency," leaving the court to construe "agency," and thus do not facially signify "Federal agency" as encompassing both the legislative and judicial branches.

The preferred resolution of this issue turns on the burden of proof to establish jurisdiction, which is solely plaintiffs'. Against the principle that waivers of sovereign immunity must be strictly construed is the language of *Ramcor,* characterizing one phrase of the ADRA as "very sweeping in scope," 185 F.3d at 1289, and the legislative history quoted in *Hewlett–Packard,* 41 Fed.Cl. at 104,[11] which counsels a liberal reading of the ADRA's jurisdictional provisions.

The court concludes that the term "agency" in 28 U.S.C. § 451 does not reach the judicial branch unless any of the listed entities is the agency in question. This provision lists entities that constitute an "agency," then goes on to suggest that the definition might be limited depending on the context. At argument plaintiffs characterized the listed entities "as a laundry list, unless a more limited context is indicated." *See* Transcript of Proceedings, *Novell, Inc. v. United States,* No. 00–66C, at 57 (Fed.Cl. Apr. 19, 2000) ("Tr."). Intervenors rejoined that plaintiffs failed to establish that the AOUSC was an agency, or a department, or an independent

and the Court of Federal Claims[");] 142 Cong. Rec. S11848–01, S11849–S11850 (daily ed. Sept. 30, 1996) ( [")For 4 years, the consolidated jurisdiction w[ill] be shared by the Court of Federal Claims and the district courts. Each court system w[ill] exercise jurisdiction over the full range of bid protest cases previously subject to review in either system. After 4 years, the jurisdiction of the district courts w[ill] terminate, and the Court of Federal Claims w[ill] exercise exclusive jurisdiction over procurement protests.")

establishment, or a commission, or an administration, or an authority, and so forth. *See* Tr. at 55–56.

Plaintiffs' argument for including the AOUSC as an administrative or executive agency rests on *Goldhaber*, in which the court held that the AOUSC was not excluded from the APA as within "the courts of the United States." The court described "the functions of the [AOUSC as] much more akin to those of an administrative or executive agency than to those of the courts." *Goldhaber*, 519 F.Supp. at 480. This court will not adopt the reasoning of an opinion that dealt with yet another definitional statute.[12] Congress did not define the term "Federal agency" for purposes of 28 U.S.C.A. § 1491(b); Congress has defined the term in the procurement context to include the AOUSC; the definition in 28 U.S.C. § 451 in comparison does not reach the judiciary; and plaintiffs have not established that the AOUSC is an agency[13] or one of the listed entities. Therefore, plaintiffs cannot show that the ADRA amendments apply to the AOUSC.

### 7. Count IV

Defendant argues that Count IV[14] should be dismissed for failure to state a claim because the AOUSC acted consistently with the terms of the solicitation in its technical evaluation of plaintiffs' proposal. Citing *W & D Ships Deck Works, Inc. v. United States*, 39 Fed.Cl. 638, 647 n. 7 (1997), defendant asks the court to consider the terms of the solicitation in ruling on a motion to dismiss, although not appended to the complaint. The rule that *W & D Ships Deck* stands for deals only with contracts and treaties, *see*

RCFC 9(h)(3), neither of which is present in this case, although one could argue that the solicitation is the operative contractual document. At argument defendant asked the court to compare one page of plaintiffs' response to the solicitation with the solicitation, purportedly to demonstrate that "it was beyond clear to [plaintiffs] how this was going to be costed," *i.e.*, that plaintiffs actually were challenging the terms of the solicitation, rather than the evaluation of their proposal. Tr. at 24. Because plaintiffs' proposal, a document not appended to the complaint, is beyond the scope of appropriate review on a motion to dismiss, *see* RCFC 12(b)(4), resolution of this issue would have required briefing on a motion for judgment on the administrative record.

### 8. Claims based on the CICA, the FAR, and the Guide in Count IV

Defendant next contends that plaintiffs' complaint must be dismissed for failure to state a claim upon which relief can be granted because the statutes allegedly violated are not applicable to the AOUSC. While conferring jurisdiction, the Tucker Act does not create a substantive right enforceable against the United States for monetary damages. *See Mitchell*, 445 U.S. at 538, 100 S.Ct. 1349; *Testan*, 424 U.S. at 398, 96 S.Ct. 948; *James M. Ellett Constr.*, 93 F.3d at 1541. Thus, to succeed, plaintiffs must identify a violation of an applicable "Act of Congress or any regulation of an executive department." 28 U.S.C.A. § 1491(a)(1). Plaintiffs allege that the AOUSC's cost evaluation violated the Competition in Contracting Act of 1984, 41 U.S.C. §§ 251–266 (1994)

---

**12.** One more statute is 5 U.S.C. § 5596(a) (1994), which defines the AOUSC as an agency, but distinguishes the AOUSC from "an executive agency." 5 U.S.C. § 5596(a) defines "agency" as:
 (1) an Executive agency;
 (2) the Administrative Office of the United States Courts, the Federal Judicial Center, and the courts named by section 610 of title 28;
 (3) the Library of Congress;
 (4) the Government Printing Office; and
 (5) the government of the District of Columbia.

**13.** The Ninth Circuit referred to the AOUSC as one of "several bodies which are closely associated with Article III courts, *administrative agencies*

... referred to ... as 'non-Article III adjuncts.'" *Tashima*, 967 F.2d at 1269 (quoting *Northern Pipeline*, 458 U.S. at 84, 102 S.Ct. 2858) (emphasis added). In so describing the AOUSC, the court was not defining the term "agency," or "Federal agency," or any other term. However, to the extent that this statement may be viewed as pertinent, the definition is more akin to "Federal agency" as defined in 40 U.S.C. § 472, than "agency" as defined in 28 U.S.C. § 451.

**14.** Originally Count III, this claim was redesignated as Count IV by the court's April 7, 2000 order.

(the "CICA"), and the Federal Acquisition Regulation, 48 C.F.R. ("FAR") Chapter 1, including, but not limited to, parts 6 and 15. By its terms the CICA applies only to "[e]xecutive agencies." 41 U.S.C. § 252(a). Similarly, the FAR applies to "executive agencies," *see* FAR § 1.101, which, as defined in FAR § 2.101, could not include the AOUSC. As the CICA and the FAR are not applicable to the AOUSC, neither can serve as a basis for granting relief.

Conceding that neither the CICA nor the FAR are themselves applicable to the AOUSC, plaintiffs nonetheless assert that the AOUSC referenced the FAR in the solicitation and thereby adopted the FAR for purposes of this procurement. In fact, plaintiffs show only that the solicitation referenced various discrete FAR provisions, but not ones relating to the submission or evaluation of proposals.

 Plaintiffs also contend that the *Guide to Judiciary Policies and Procedures,* Vol. I, Ch. VIII, "Procurement, Contracting, and Property Management" (Oct. 14, 1997) (the *"Guide"*), which establishes the procedure for the AOUSC to conduct competitive acquisitions, can have the effect of a regulation that would bind the AOUSC. In order to determine whether an agency regulation is entitled to the force and effect of law, the Federal Circuit in *Hamlet* formulated the following test:

[A] regulation [is] entitled to the force and effect of law if (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating agency conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute. In determining whether a provision was intended to be binding, the court should consider (a) whether the language of the provision is mandatory or advisory; (b) whether the provision is "substantive" or "interpretive"; (c) the context in which the provision was

promulgated; and (d) any other extrinsic evidence of intent.

63 F.3d at 1105; *see also Wolcott v. United States,* 43 Fed.Cl. 581, 588 (1999) (holding personnel handbook unenforceable as regulation); *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 839 (1999) (holding Contract Information Bulletin did not bind agency). Therefore, to be entitled to force and effect of law, a binding agency regulation "must, *at the very least,* be promulgated by an agency with the intent that it establishes a binding rule. Promulgation requires some act of publication, i.e., dissemination to the public." *Labat–Anderson,* 42 Fed.Cl. at 839 (emphasis added) (citing *Hamlet,* 63 F.3d at 1105). As defendant notes, the *Guide* is not published for the public, and plaintiffs have not argued that the *Guide* is available to the general public. Consequently, the *Guide* is not entitled to the force of law, and the claims based on references on the CICA, the FAR, and the *Guide* in Count IV must be dismissed on the merits.

### 9. *Counts I, II, and III*

 Defendant's final contention is that Counts I, II, and III [15] should be dismissed because they were not timely filed. These counts, defendant argues, challenge the terms of the solicitation, rather than the evaluation process. Offerors may challenge the terms of the solicitation, but only prior to submission of final proposals. *See, e.g., Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963); *Allied Tech. Group, Inc. v. United States,* 39 Fed.Cl. 125, 146 (1997); *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 358 (1994). In considering plaintiffs' motion to amend the complaint, this court ruled that plaintiffs' claims challenge the evaluation process, not the terms of the solicitation. Furthermore, the court granted plaintiffs' motion only to the extent that the amendments challenge the evaluation process. The ruling that plaintiffs' challenges to the terms of the solicitation would be untimely, but that they were alleging disparate treatment, applies here

---

**15.** Originally Counts I and II, these claims were redesignated Counts I, II, and III by the court's

April 7, 2000 order.

with equal force. *See* Order entered on Apr. 7, 2000.

### CONCLUSION

Accordingly, based on the foregoing:

1. Defendant's and intervenors' motions are granted. The Clerk of the Court shall dismiss the amended complaint without prejudice for lack of subject matter jurisdiction.

2. By May 5, 2000, the parties shall file requests for deletion of protected/privileged material before the court issues its opinion for publication.

**IT IS SO ORDERED.**

No costs.