OFFICE DEPOT, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

Staples, Inc., Intervenor-defendant.

No. 10–335 C.

United States Court of Federal Claims.

Aug. 24, 2010.[1]

1. This opinion was issued under seal on July 26, 2010. Pursuant to ¶ 7 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. Brackets ( [ ] ) identify the redacted portions of the opinion.

John G. Horan, Washington, DC, for plaintiff. Luke W. Meier and Steffen G. Jacobsen, Washington, DC, of counsel.

Robert C. Bigler, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Brian M. Simkin, Assistant Director, Washington, DC, for defendant.

Jonathan S. Aronie, Washington, DC, for intervenor-defendant. Anne B. Perry, Washington, DC, of counsel.

## OPINION AND ORDER

BUSH, Judge.

This bid protest challenges the award of a large office supplies contract (the contract) by the Federal Deposit Insurance Corporation (FDIC). Plaintiff Office Depot, Inc. (Office Depot) filed its post-award bid protest complaint on June 1, 2010, and amended that complaint on June 2, 2010. Staples, Inc. (Staples), the contract awardee, moved to intervene on June 4, 2010, and its motion was granted the same day. Plaintiff's bid protest is now before the court on defendant's motion to dismiss brought pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), plaintiff's motion for judgment on the administrative record, and defendant's and intervenor-defendant's cross motions for judgment on the administrative record.[2] Plaintiff asserts that the award to Staples was "unreasonable and contrary to law." Pl.'s Mot. at 1.[3]

The administrative record (AR) of this procurement was filed on June 11, 2010, and briefing was filed according to an expedited schedule.[4] Oral argument was held on July 19, 2010. For the reasons set forth below, defendant's and intervenor-defendant's motions for judgment on the administrative record are granted.

## BACKGROUND

### I. Acquisition Events up to Proposal Submission on January 6, 2010

#### A. Acquisition Plan

In October 2009, the FDIC approved an acquisition plan for a nationwide office supplies contract. AR Tab 1. Office Depot was the incumbent contractor providing these supplies. AR at 2. Office Depot's contract, originally expected to expire in 2011, had incurred costs "much higher than anticipated, primarily due to the banking crisis," and would terminate on February 28, 2010. AR at 6. The plan recognized a need for "an acceleration of the acquisition planning for a new office supply contract." *Id.* Adjustments were made to the acquisition in light of the "short cycle for award." AR at 8; *see* AR at 1 (noting "[m]itigation plans" in case of a delayed contract award), 2 (eliminating

2. The parties agreed that plaintiff's motions for a temporary restraining order and a preliminary injunction could best be resolved through a decision on the merits of plaintiff's bid protest.

3. The first page of plaintiff's motion is marked "34," rather than "1."

4. On June 18, 2010, plaintiff moved to supplement the administrative record with deposition testimony of an FDIC employee. This motion, opposed by defendant and intervenor-defendant, was fully briefed by June 23, 2010 and was denied on June 25, 2010. *See* Order of June 25, 2010. Defendant moved to amend the record on July 1, 2010, seeking to replace black-and-white copies of certain color originals with color copies. This unopposed motion was granted the same day. *See* Order of July 1, 2010.

past performance evaluations and oral presentations).

## B. Solicitation Requirements

Solicitation No. CORHQ–09–R–0347 issued on November 24, 2009.[5] AR at 195. Under the terms of the contract, the successful offeror will provide office supplies to FDIC headquarters and offices throughout the country, as well as "drop ship" office supplies in all 48 contiguous states. AR at 104. Purchases at the contractor's retail outlets will be subject to the same discounts as supplies delivered under the contract. *Id.* The contract will begin with a two-year base period, and include three option years. AR at 94, 163. Each offer consists of a firm-fixed-price pricing proposal, as well as a mission capability proposal. AR at 164. The contract would be awarded to the offeror providing the best value to the FDIC. AR at 91, 168, 170.

The pricing proposal provides the FDIC with the offeror's price schedule for office supplies, following the format set forth in Section B of the solicitation. *See* AR at 93–101. The prices entered into the price schedule indicate base period and option year prices for commonly ordered items ("core items"), as well as a total core items price for the contract. AR at 99. The price schedule also indicates discounts from catalog prices for other supplies, and a total non-core items price for the contract. AR at 100. Finally, the price proposal indicates the total price for office supplies delivered through the contract. AR at 101.

The mission capability proposal, on the other hand, includes three rated components, or "subfactors," as well as an information technology security plan and a subcontractor plan. AR at 164–65. The mission capability proposal subfactors will be discussed in detail in the evaluation description section of this opinion. Offerors were informed that their mission capability proposals should be "specific and complete," and that "[l]egibility, clarity and coherence are very important." AR at 164.

Questions regarding the solicitation were due by December 8, 2009. AR at 83. Answers to these questions were provided on December 11, 2009. AR at 2549–50. Eight proposals were received in response to the solicitation. AR at 173.

## C. Evaluation Description in the Solicitation

### 1. Price Proposals

According to the solicitation, each price proposal is evaluated for completeness, reasonableness and realism. AR at 169. Price comparisons are used to determine price reasonableness, and proposals are complete if prices are submitted in accordance with schedules set forth in the solicitation. *Id.* "The Contracting Officer may also evaluate the Overall Evaluated Price (OEP) for each offeror." *Id.*

### 2. Mission Capability Proposals

Three rated "subfactors" are presented in each offeror's mission capability proposal. AR at 165. These subfactors are Technical Approach, Management Plan and Key Personnel. *Id.* The first two subfactors are further divided. Technical Approach is divided into four components: Supplies and Equipment, Electronic Ordering, Delivery Network, and Statutory Compliance. AR at 166. Management Plan is divided into Customer Service and Quality Assurance and Control. *Id.*

One hundred points are available in the evaluation of mission capability in each offeror's proposal, with this breakdown:

| | |
|---|---|
| *Technical Approach* | |
| Supplies and Equipment | 20 points |
| Electronic Ordering | 20 points |
| Delivery Network | 20 points |
| Statutory Compliance | 10 points |
| *Management Plan* | |
| Customer Service | 7.5 points |
| Quality Assurance and Control Plan | 7.5 points |
| *Key Personnel* | 15 points |
| Perfect Rating | 100 points |

AR at 168 (formatted for clarity). The ratings of these components of the mission capa-

---

5. An amended solicitation was issued on or about December 11, 2009, extending the deadline for proposals until January 6, 2010. *See* AR at 162, 2549. The court cites primarily to the amended solicitation in this opinion.

bility proposal produce an overall numerical score, with adjectival ratings applied to these ranges: 90–100 (Excellent), 80–89 (Very Good), 70–79 (Good), 60–69 (Marginal), 0–59 (Poor).[6] AR at 169. The adjectival ratings also describe that score range's characteristics, such as the offeror's level of understanding of solicitation requirements, the presence or absence of weaknesses and deficiencies in a proposal, and the offeror's chance of success in performance of the contract. *Id.* The overall goal of the rating scale was to identify "strengths and weaknesses of the offeror's proposal and [to] assess the extent to which offeror's proposed technical and management solutions fulfill the functional requirements and meet [the] FDIC's needs." *Id.* The solicitation noted that "[c]umulative points will reflect the quality of the offeror's proposal for Mission Capability." *Id.*

### 3. Best Value Award

The solicitation sets forth several statements concerning the evaluation and selection of the "best value" proposal. First, mission capability and price are of "equal importance." AR at 168. Next, the solicitation further describes the relationship between mission capability and price:

> Subjective judgment is implicit in the analysis of best value. The best value may not necessarily be represented by the lowest price offered. Price is not expected to be the most significant factor in the selection of a Contractor from this solicitation. The degree of importance of price as a factor, however, could increase depending upon how equally matched the competing proposals are for the other factors evaluated. When competing proposals are judged to be equal upon evaluation of the other factors considered in the best value analysis, total price and other price factors would become the most significant factor.

*Id.* The evaluation of best value is further described by this passage:

6. The court notes that the FDIC evaluators used the term "Fair" instead of "Marginal" for an evaluation score of 64.2. AR at 172–73, 196.

7. The court reserves its description of post-bid submission communications between the FDIC and offerors, much of which is roughly contem-

FDIC will base the award on an integrated assessment of the evaluation factors and sub-factors. FDIC has the sole discretion to determine which proposal(s) represents the best value to the FDIC. A technically acceptable offer other than the one with the lowest-evaluated price may be awarded the contract.

AR at 170. The court now turns to the evaluations of the eight proposals received by the FDIC.[7]

### II. Evaluation Results

Of the eight proposals received, two failed to include a mission capability proposal, were accordingly rated unresponsive to the solicitation and were not considered for award. AR at 173, 195. Of the remaining six proposals, two received low mission capability scores, 64.2 and 27.4 points, and were not considered for award due to these low ratings. AR at 196. Thus, only the proposals with the highest mission capability ratings were considered viable proposals by the Technical Evaluation Panel (TEP). Of the four viable proposals, the highest priced offer, ranked third in mission capability with a score of 80.8/Very Good, was eliminated as too costly. *Id.* at 196–97.

The three remaining proposals received these mission capability ratings: Staples—95.9/Excellent; OfficeMax Inc. (Office Max)—92.0/Excellent; Office Depot—[ ]. AR at 196. The total evaluated prices for these proposals were: Office Max—$[ ]; Staples—$9,281,443; Office Depot—$[ ].[8] All three price proposals were determined to be realistic, as well. AR at 192.

The agency's description of its best value determination among these three offerors, Staples, Office Max and Office Depot, is reproduced here in its entirety:

> The low priced proposal was offered by Office Depot. Office Depot obtained a technical rating of [ ]. There is some confi-

poraneous with the proposal evaluation process, for the discussion section of this opinion.

8. The other proposals considered responsive to the solicitation had total evaluated prices of $11,987,311, $11,013,116 and $9,391,354.

dence that Office Depot could perform satisfactorily but concerns remain. When compared to the offers from Staples and Office Max, Office Depot received [ ]. These evaluation factors are critical to satisfactory performance. The proposals that offer the FDIC the greatest assurance of satisfactory performance at a reasonable price are the proposals from Staples and Office Max, both of which are rated Excellent. For those reasons, the proposal from Office Depot was not considered for award and the final selection was considered between the two Excellent rated proposals. The award to one of the Excellent rated offerors trades a slightly higher price for a much greater confidence that the FDIC will receive satisfactory performance over the life of the contract.

The proposals from Staples and Office Max, were technically rated as Excellent, with Staples scoring slightly higher in overall points (95.9 vs. 92.0) and there is a high confidence both companies could perform successfully. The strengths of the Staples proposal over the Office Max proposal were its slightly lower price, higher percentage of Trade Agreement Act compliant items, higher number of retail stores, [ ] and more highly rated customer service/quality assurance programs.

Based upon the above findings, and giving appropriate consideration to the evaluation criteria set forth in the solicitation, the consensus of the Technical Evaluation Team is as follows: Staples and Office Max are both highly qualified, have identified the resources needed to perform the requirement and their technical proposals are similar. However, when considering a detailed assessment of the advantages and disadvantages associated with each, the Technical Evaluation Panel has concluded that the proposal submitted by Staples provides the best value for the FDIC requirement. Accordingly, the TEP recommends award to Staples.

The Contracting Officer considers Staples to be the best value between Excellent rated proposals due to its lower price, higher technical score, [ ], greater availability of Trade Agreement Act compliant items and superior customer service/quality assurance programs. The recommendation of the Contracting Officer and the Technical Evaluation Panel is to award this requirement to Staples.

AR at 197. The decision to award the contract to Staples was approved on February 5, 2010. AR at 200. Award of the contract to Staples occurred on March 4, 2010. AR at 1730.

### III. Protests

#### A. Agency

Office Depot was notified on March 5, 2010 that it was not the successful offeror for the contract. AR at 1815, 1823. On March 15, 2010, Office Depot was debriefed as to the FDIC's award decision. AR Tab 12. On March 18, 2010, Office Depot contacted the FDIC contracting officer, Mr. Steven West, to lodge a protest of his award decision. AR at 223. In a letter dated March 24, 2010, Mr. West denied Office Depot's protest.[9] AR at 239–41.

On April 13, 2010, Office Depot appealed Mr. West's denial of its agency protest. AR Tab 6. The FDIC denied the appeal. AR Tab 7. According to the FDIC, all proposals were properly evaluated to determine the best value to the FDIC, past performance evaluations of offerors were properly waived, and communications with offerors after the submission deadline were "minor clarifications" and proper. AR at 262.

#### B. Complaint

On June 1, 2010, Office Depot filed a bid protest complaint in this court, which was amended the next day. Therein, plaintiff challenges the FDIC's evaluation of its mission capability proposal, the communications held with some offerors but not others, the

---

9. Office Depot represented to the FDIC that Mr. West's letter was received on March 30, 2010, but the FDIC apparently disagreed and asserted that the letter was received by Office Depot on March 29, 2010. *Compare* AR at 204 *with id.* at

261. According to the FDIC, Office Depot's appeal of Mr. West's denial of the protest was untimely, but the agency nonetheless considered the merits of the appeal. AR at 261.

omission of past performance as a factor in proposal evaluation, and the agency's best value determination. Compl. ¶ 51. Office Depot requests injunctive relief "preventing FDIC and Staples from proceeding with work under" the solicitation, cancellation of the award of the contract, reevaluation of proposals and a best value award of the contract, or, in the alternative, an opportunity "to address proposal areas where FDIC requires additional information," followed by a "new" evaluation of proposals and a best value award of the contract. *Id.* at 13.

## DISCUSSION

### I. Bid Protest Jurisdiction

■■■ This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002) (citation omitted).

### II. Standard of Review for Judgment on the Administrative Record

■■■ RCFC 52.1(c) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356–57 (Fed. Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

### III. Bid Protest Review

#### A. In General

■■■ The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC,* 316 F.3d at 1319. Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE* )). Bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE,* 258 F.3d at 1302). A protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement, and has standing before this court. *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307–08 (Fed.Cir.2006) (citations omitted).

■■■ As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [ (2006) ]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (*Banknote II* ) (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1085–86 (Fed.Cir.2001) (*Emery* ) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332–33 (Fed.Cir.2001)). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States,* 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid

protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988)).

 The higher the degree of discretion allotted the contracting officer, the more difficult it is for a protestor to prove that the procurement decision was arbitrary or capricious. *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 597 (1980) (citing *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974)). Negotiated procurements give a "breadth of discretion" to the contracting officer, and impose a heavier burden of proof on a protestor. *Id.* at 598 (citing *Keco*, 492 F.2d at 1204). Furthermore, "best value" contract awards give a contracting officer more discretion than awards based on price alone. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir.2004) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996)). Thus, the protestor's burden is especially heavy in negotiated, best value procurements. *Banknote Corp. of Am. v. United States*, 56 Fed.Cl. 377, 380 (2003) (*Banknote I* ) (citations omitted), *aff'd*, 365 F.3d 1345 (Fed.Cir.2004).

 In addition, the court may not substitute its judgment for the agency's expertise in procuring services to meet the needs of the government. *See, e.g., Ala. Aircraft Indust., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed.Cir.2009) (reversing this court when it "substitut[ed] . . . the court's judgment for the agency's with regard to how the contract work should be designed" (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))). Instead, the court must "determine whether the agency's . . . analysis [of proposals] was consistent with the evaluation criteria set forth in the [solicitation]." *Id.* at 1375–76 (citation omitted). The court will

"sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citation omitted).

 " 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement errors of the agency, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

**B. Special Considerations in Bid Protests Concerning the FDIC**

The court notes that this procurement is not subject to the Federal Acquisition Regulation (FAR), and that the analytical framework normally supplied by the FAR and by cases interpreting the FAR is of limited assistance in this matter.[10] *See* AR at 1842 (FDIC Acquisition Policy Manual) (noting that the FAR does not apply to FDIC procurements). When the Federal Circuit has

---

10. Counsel at oral argument opined that cases interpreting the FAR may assist in deciding whether procurement actions taken by the FDIC lack a rational basis. The court agrees that analogies may sometimes be drawn to these cases, especially when basic procurement principles, present both in the FAR and in the FDIC

manuals discussed *infra,* are elucidated in decisions resolving bid protests. If a cited case merely decides whether or not an agency action violated a particular FAR provision, however, such a decision provides no guidance in this matter.

reviewed United States Postal Service (USPS) procurements, which also are not subject to the FAR, the USPS purchasing manual has provided the appropriate procedural standards, not the FAR. *See Banknote II,* 365 F.3d at 1356–57 (highlighting key differences between the FAR and the USPS purchasing manual, and reviewing procurement actions for their consistency with the manual's provisions); *Emery,* 264 F.3d at 1089 (holding that the procurement in that case was consistent with the USPS purchasing manual). The Federal Circuit noted that the USPS purchasing manual "is incorporated by reference into USPS regulations." *Banknote II,* 365 F.3d at 1349 n. 1. This court has followed *Banknote II* and reviewed USPS procurements according to the procedural standards set forth in USPS purchasing manuals, commenting that these USPS acquisition manuals have the force of law because they are referenced in regulation. *Asia Pac. Airlines v. United States,* 68 Fed. Cl. 8, 21–22 & n. 14 (2005) (*Asia Pacific*); *XTRA Lease, Inc. v. United States,* 50 Fed. Cl. 612, 620 (2001); *see also CW Gov't Travel, Inc. v. United States,* 53 Fed.Cl. 580, 593 (2002) (reviewing a USPS procurement for violations of the USPS purchasing manual); *T & S Prods., Inc. v. United States,* 48 Fed.Cl. 100, 109 (2000) (same).

In other cases, however, this court has considered an agency's acquisition-related documents to lack the formality required to provide a procedural standard against which a procurement may be measured. In *Infrastructure Defense Technologies, LLC v. United States,* 81 Fed.Cl. 375, 397 (2008) (*IDT*), an agency "directive" was not shown to have "the effect of a statute or regulation such that acting inconsistently with its provisions would constitute grounds to set aside or enjoin th[e] solicitation." The procurement in *IDT* was subject to the FAR, and is thus distinguishable from *Banknote II, Asia Pacific, XTRA Lease,* and this case. In *Novell, Inc. v. United States,* 46 Fed.Cl. 601, 614–15 (2000), the court, after deciding that it was without jurisdiction to review a procurement of the Administrative Office of the United States Courts, nonetheless opined that the procurement chapter of that entity's Guide to Judiciary Policies and Procedures was "not

entitled to the force of law" and could not support a claim alleging a violation of procurement procedure. In *Novell,* the guide was considered to be a non-binding document because it was unpublished and there was no indication that the guide was available to the general public. *Id.* Similarly, regarding a procurement subject to the FAR, this court held that an unpublished bulletin circulated to agency contracting personnel did not provide a binding procedural standard that could support a bid protest. *See Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 839–40 (1999) ("To have the force and effect of law, therefore, a regulation must, at the very least, be promulgated by an agency with the intent that it establishes a binding rule. Promulgation requires some act of publication, i.e., dissemination to the public.") (citation omitted).

Although the FDIC Acquisition Procedures, Guidance and Information document (hereinafter, FDIC manual) is apparently not incorporated by reference in any federal regulation, the FDIC manual is public information and is easily accessed by contractors and the general public. *See* FDIC website, available at http://www.fdic.gov/buying/goods/acquisition/apm/PGI.html (last visited July 20, 2010). Because FDIC procurements are not subject to the FAR, the published FDIC manual provides the only procedural standards for FDIC procurements. The FDIC manual is therefore more like the USPS purchasing manual than the other bulletins, directives and guides rejected by this court as not providing procedural standards for procurements. The court will therefore review the communications between the FDIC and Staples for conformance with the procedures set forth in the FDIC manual.

## IV. Threshold Issues

### A. Jurisdiction

#### 1. Protests of FDIC Contract Awards

The parties do not dispute this court's jurisdiction over the request for injunctive relief presented in plaintiff's bid protest complaint. Pl.'s Mot. at 13; Def.'s Mot. at 11; Staples' Mot. at 7. Plaintiff did not specifically request relief other than injunctive relief

in the complaint.[11] Compl. at 13. Defendant asserts that this court should "dismiss Office Depot's money claims." Def.'s Mot. at 11. Plaintiff's presentation of any monetary claims in this suit was unclear until oral argument, when plaintiff's counsel confirmed that Office Depot seeks bid preparation and proposal costs. *Cf.* Pl.'s Mot. at 13 (noting that this court's jurisdiction over monetary claims against the FDIC is the subject of some controversy, and suggesting that even if this court lacks jurisdiction over a request for bid preparation costs against the FDIC, the "Court [nonetheless] has jurisdiction to hear all of the Counts set forth in Office Depot's Complaint"); *id.* at 31 (stating that absent injunctive relief, "Office Depot's only remedy would be the recoupment of its bid and proposal costs"); Pl.'s Reply at 2 (mentioning, without citation to the complaint, plaintiff's "request for damages"). In any case, because the court has jurisdiction, *see infra,* over plaintiff's request for injunctive relief, and the court's disposition of that request precludes an award of bid preparation and proposal costs to plaintiff, the court need not address the question of whether, in the bid protest context, this court has jurisdiction over a monetary claim against the FDIC.

 Whether or not protests against FDIC procurements are within this court's bid protest jurisdiction appears to be an issue of first impression. This question can be answered by determining whether the FDIC is a "Federal agency" for purposes of 28 U.S.C. § 1491(b)(1).[12] *Emery,* 264 F.3d at 1080 (stating that "28 U.S.C. § 1491(b)(1) ... gives the Court of Federal Claims jurisdiction over actions objecting to proposed or actual contract awards 'by a federal agency' "). For this jurisdictional inquiry, the term federal agency is defined by 28 U.S.C. § 451 (2006). *Emery,* 264 F.3d at 1080. The definition includes

> any department, independent establishment, commission, administration, authority, board or bureau of the United States or *any corporation in which the United States has a proprietary interest,* unless the context shows that such term was intended to be used in a more limited sense.

28 U.S.C. § 451 (emphasis added); *see also Emery,* 264 F.3d at 1080 (equating the definition of federal agency in 28 U.S.C. § 1491(b)(1) with the definition of agency in 28 U.S.C. § 451).

The United States Court of Appeals for the Fifth Circuit has found that the FDIC is an "agency" as that term is defined by 28 U.S.C. § 451. *See Rauscher Pierce Refsnes, Inc. v. FDIC,* 789 F.2d 313, 313 (5th Cir. 1986) ("Our review of statutory law, case law and the functioning, financing, and management of the FDIC convinces us that it is an agency of the United States as that term is used in ... 28 U.S.C. [§ ] 451...."). The FDIC is a "mixed-ownership" Government corporation. 31 U.S.C. § 9101(2)(B) (2006). In the court's view, the FDIC is a corporation in which the United States has a proprietary interest and thus is an agency for the purposes of § 451 and a federal agency for the purposes of § 1491(b)(1).[13] Protests of FDIC procurements are within the jurisdiction of this court under 28 U.S.C. § 1491(b)(1).

### 2. Office Depot's Standing

 Only a protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement and standing before this court.[14] *Rex Ser-*

---

11. The complaint requests a temporary restraining order and a preliminary injunction. Plaintiff's motion for judgment on the administrative record refers to declaratory relief and injunctive relief. Pl.'s Mot. at 1.

12. The FDIC Acquisition Policy Manual states that several statutes governing federal procurements do not apply to FDIC procurements, but does not assert that 28 U.S.C. § 1491(b)(1) is among these "non-applicable" statutes. AR at 1842.

13. " 'The phrase "corporation in which the United States has a proprietary interest" is intended to include those governmental corporations in which stock is not actually issued, as well as those in which stock is owned by the United States. It excludes those corporations in which the interest of the Government is custodial or incidental.' " *Acron Invs., Inc. v. Fed. Sav. & Loan Ins. Corp.,* 363 F.2d 236, 240 (9th Cir.1966) (citations omitted).

14. Only an "interested party" has standing to bring a bid protest in this court under § 1491(b)(1). The FDIC defines an "interested

*vice*, 448 F.3d at 1307–08. Neither defendant nor intervenor-defendant challenges Office Depot's standing to bring this protest. Here, Office Depot's proposal was the least expensive of all of the responsive proposals received. AR at 195–96. Office Depot's proposal was rated [ ] in the technical evaluation, but had a substantial chance of being chosen for award if the evaluation errors alleged by plaintiff were corrected. For this reason, Office Depot has standing to bring this bid protest.

### B. Waiver of Challenge to the FDIC's Decision Not to Evaluate Past Performance

 The waiver rule established by the Federal Circuit states that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed.Cir.2007). As this court has noted, "*Blue & Gold [Fleet* ] has been consistently interpreted as standing for the proposition that '[t]he proper time to challenge the provisions of a prospectus is before bids are required to be submitted.'" *Allied Materials & Equip. Co. v. United States*, 81 Fed.Cl. 448, 459 (2008) (citations omitted). Among the many reasons for this rule cited by the Federal Circuit is the need for " 'expeditious resolution' " of bid protests before this court. *Blue & Gold Fleet*, 492 F.3d at 1315 (quoting 28 U.S.C. § 1491(b)(3) (2006)). The waiver rule thus "avoids costly after the fact litigation." *IDT*, 81 Fed.Cl. at 389 (citing *Blue & Gold Fleet*, 492 F.3d at 1314).

 Here, Office Depot suggests that the FDIC could not award the contract without evaluating the past contract performance of the offerors. Pl.'s Mot. at 28. This argument is waived because the solicitation clearly did not require submission of past contract performance information, and the evaluation

scheme did not accord any weight to past performance. *See* AR at 162–70. If Office Depot wished to challenge an evaluation scheme that omitted any requirement for and placed no emphasis on past performance, the time to have done so was before January 6, 2010.

Even if this argument were not waived, the court does not find the FDIC's decision to omit past performance criteria from its evaluation scheme to be arbitrary or capricious. Streamlining the evaluation process to save time appears to be a rational decision, because even with this streamlining, contract award was delayed beyond the original projected award date by approximately two months. *Compare* AR at 6 *with id.* at 1730. Nor does this decision to omit any evaluation of past performance appear to violate FDIC's procedures, because appropriate approvals were obtained. *See* AR at 2, 7–8; *see also id.* at 1840, 1899–1900 (discussing approvals and legal review of "deviations" from acquisition policies and procedures).

### C. Waiver of Argument Not Presented until Oral Argument

 At oral argument, plaintiff suggested for the first time that the evaluation of Staples' price proposal was fundamentally flawed as to the calculation of the price for Staples' non-core items because Staples' [ ] percent discount was subject to a limiting condition. This argument is entirely absent from the argument section of plaintiff's opening brief, which discusses numerous evaluation errors alleged to have occurred in this procurement. Pl.'s Mot. at 14–22. A brief reference is made to Staples' description of its catalog price discount for non-core items in the fact section of plaintiff's moving brief. *See id.* at 8 (referring to Staples' discount as "inflated," "conditional," and subject to a "fine print ... qualification"). No mention of Staples' non-core items discount is made in plaintiff's reply brief. Because plaintiff's argument was not presented to the court until

party" for the purposes of an agency protest as "[a]ny contractor who is included on the solicitation list and has submitted a proposal in response to the solicitation." AR at 1896. The definition of interested party used in bid protests

in this court is quite different, and derives from a binding interpretation of the term "interested party" found in § 1491(b)(1). *See AFGE*, 258 F.3d at 1302 (interpreting 28 U.S.C. § 1491(b)(1)).

oral argument, the court considers this argument waived. *See Arakaki v. United States*, 62 Fed.Cl. 244, 246 n. 9 (2004) ("The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete." (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed.Cir.2002); *Cubic Def. Sys., Inc. v. United States*, 45 Fed.Cl. 450, 467 (1999))).

■ Even if this argument were not waived, the court is not persuaded that the FDIC's evaluation of Staples' price proposal was significantly skewed by its calculation of the total price for non-core items. Non-core items prices were, as plaintiff concedes, far less important than core items prices, which "made up the vast majority of each offeror's total evaluated price." Pl.'s Mot. at 21. The solicitation explicitly permitted exceptions to an offeror's quoted catalog price discount. AR at 94. Office Depot also listed exceptions to its quoted discount. AR at 955, 965–75. Office Depot's evaluated price for non-core items was not corrected to reflect the exceptions to its quoted discount of catalog prices. *Compare* AR at 196 *with id.* at 961. Staples' evaluated non-core items price received similar treatment. The court finds that the price evaluation conducted by the FDIC was not irrational or inequitable by reason of the total non-core items price assigned to Staples' proposal.[15]

## V. The TEP Evaluation of Office Depot's Mission Capability Proposal

Plaintiff disagrees with the weaknesses that the TEP found in Office Depot's mission capability proposal. Pl.'s Mot. at 15 (stating that the TEP ratings of Office Depot's mission capability proposal were "primarily based on irrational or erroneous evaluative judgments" and that "[n]early all [of the weaknesses cited by the TEP] were arbitrary, irrational or simply incorrect"). Plaintiff also argues that the overall rating for the mission capability volume of its proposal was too low. *Id.* at 16 ("The [ ] point gap between Staples' and Office Depot's technical proposal ratings cannot be rationally justified by the superficial differences between proposals."). Plaintiff asserts that the TEP ratings its proposal received were overly harsh, especially when compared with the ratings received by Staples. *Id.* at 15 ("FDIC's evaluation was rife with irrational judgments and blatant errors which greatly inflated Staples' superficial technical advantage."). Plaintiff concludes that the evaluation of its mission capability proposal was unreasonable. Pl.'s Reply at 28.

■ Before the court turns to the FDIC's rating of the mission capability proposal submitted by Office Depot, it is important to note that the solicitation notified offerors that mission capability and price were of equal weight in the evaluation of proposals. Thus, technical aspects of the offerors' proposals were very important and could be determinative of award. *See* AR at 168 ("Price is not expected to be the most significant factor in the selection of a Contractor from this solicitation."). Plaintiff argues that it was irrational for the FDIC to rely so heavily on mission capability scores in choosing the best value proposal in this procurement. *See* Pl.'s Mot. at 14–15 (stating that the "FDIC's best value decision is exposed as an irrational determination that minor delivery nuances were worthy of a significant price premium on a contract where offerors were competing to provide exactly the same defined office supply products"); Pl.'s Reply at 4 (stating that "the FDIC has justified its award to the higher-priced offeror based solely on adjectival ratings, without demonstrating that the difference between 'Excellent' and '[ ]' equated to sufficient monetary value"). To the extent that plaintiff may be contending that the importance placed on mission capability by the solicitation was unreasonable, that argument is untimely and

---

15. Even if the FDIC's price evaluation of Staples' price for non-core items was erroneous, Office Depot has not shown that it was prejudiced by the alleged error, *see Bannum*, 404 F.3d at 1353 (stating that a protest may be maintained only if "errors in the procurement process significantly prejudiced" the protestor), or that it suffered particularized harm as a result of the alleged error, *see Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1380 (Fed.Cir.2009) (stating that a protestor must show that the alleged procurement error caused it "to suffer disparate treatment or particularized harm").

waived.[16] *Blue & Gold Fleet,* 492 F.3d at 1315.

 The court also notes that plaintiff's challenge to the TEP's technical ratings of Office Depot's proposal must overcome the "great deference" this court gives such ratings. *Textron, Inc. v. United States,* 74 Fed. Cl. 277, 297 (2006). "[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss,* 77 F.3d at 449 (citations omitted); *Omega World Travel, Inc. v. United States,* 54 Fed.Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing *E.W. Bliss,* 77 F.3d at 449)). With these principles in mind, the court turns to the mission capability ratings challenged in this bid protest.

### A. Office Depot's Overall Mission Capability Score

 Among the responsive offerors, the TEP ranked Office Depot [ ] of six in mission capability, allotted Office Depot [ ] of 100 points, and thus rated Office Depot "[ ]" for mission capability. AR at 173, 196. According to the solicitation, a "[ ]" rating has this meaning:

[ ].

AR at 169. The TEP provided the following summary of Office Depot's mission capability consensus rating:

[ ].

AR at 191–92. The Selection Recommendation Report (SRR) summarized the rating of Office Depot's mission capability proposal in this manner:

> There is some confidence that Office Depot could perform satisfactorily but concerns remain. When compared to the offers from Staples and Office Max, Office Depot received [ ]. These evaluation factors are critical to satisfactory performance.

**16.** Plaintiff's challenge to the FDIC's weighing of price and mission capability in its best value determination is discussed in more detail in the final discussion section of this opinion.

**17.** The court's discussion of these arguments necessarily condenses some of plaintiff's conten-

AR at 197. Although the text of the TEP evaluations, the TEP report and the SRR is occasionally marred by the awkward sentence or phrase, the record is generally understandable, rational and consistent with the evaluation scheme set forth in the solicitation.

### B. Plaintiff's Allegations of Mission Capability Scoring Errors

Plaintiff contests a large number of the evaluation comments and numerical scores that Office Depot's mission capability proposal received.[17] The court's review of plaintiff's arguments has been comprehensive, and the overall result is that even though some evaluation errors occurred, these errors were *de minimis.* Plaintiff has not persuaded the court that Office Depot's mission capability score of [ ] points was arbitrary, capricious, or irrational, or that the SRR's reliance on Office Depot's "low technical scores for Supplies/Equipment, Electronic Ordering and Delivery Network" as critical factors in rejecting Office Depot's proposal, AR at 197, was flawed. The court finds that the FDIC's technical evaluation of Office Depot's proposal, given appropriate deference, was not arbitrary, capricious, irrational, an abuse of discretion or contrary to law.

 Before turning to specific ratings and scores, the court notes that plaintiff criticizes the FDIC for repeatedly "downgrading" Office Depot's proposal for not having enough detail or specific information. *See* Pl.'s Mot. at 17 n. 8 ("This is one of numerous instances where the FDIC inappropriately downgraded Office Depot's technical score for providing insufficient information on subjects not required by the Solicitation."). As this court has stated, "[w]hen weighing the merits of a proposal under a specific evaluation factor, an agency 'may consider all matters that offerors would reasonably have believed to be within the scope of the factor.' " *Forestry Surveys & Data v. United States,*

tions regarding the FDIC's evaluation of Office Depot's mission capability proposal. The court nonetheless considered all of plaintiff's allegations of error, and finds therein no evidence of significant procurement errors.

44 Fed.Cl. 493, 497 (1999) (citation omitted). Furthermore, "agency evaluation personnel are given great discretion in determining the scope of an evaluation factor." *Id.* at 499 (citation omitted). As this court has often found, "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Banknote I,* 56 Fed.Cl. at 387 (internal quotations and citations omitted). Therefore, the FDIC had the discretion to award or withhold points for proposal components or omissions that were reasonably within the scope of the evaluation criteria set forth in the solicitation.

### 1. Supplies and Equipment—[ ] of 20 Points

 The weaknesses in this area were critical to the decision not to award to Office Depot. AR at 197. The TEP stated that:
[ ].
AR at 181. Although plaintiff suggests that the toner recycling information in its proposal was adequate, Pl.'s Mot. at 17, Pl.'s Reply at 27–28 & nn. 32–33, it is clear from the solicitation that several aspects of toner recycling were of interest to the FDIC. *See* AR at 109 ("For each toner cartridge in the FDIC Core Items List, the contractor shall provide pricing that reflects front end saving and a discount on spent toner cartridges upon return to the contractor. Additionally, the contractor shall make available both new ... toner cartridges and remanufactured toner cartridges. The contractor shall propose a method to recycle all spent toner cartridges along with added value benefits such as credits, rebates, or reward points for

return cartridges."). It is also clear from the solicitation that updated office supply pricing information was important to the FDIC. *See* AR at 109, 111. Upon review of the Technical Approach section of Office Depot's mission capability proposal, AR Tab 9.04, the court finds nothing arbitrary or capricious in the weaknesses noted in the Supplies and Equipment component of Office Depot's Technical Approach, or the [ ] point rating received for Supplies and Equipment.[18]

### 2. Electronic Ordering—[ ] of 20 Points

 The weaknesses in this area were also critical to the decision not to award to Office Depot. AR at 197. The TEP stated that:
[ ].
AR at 181. Plaintiff does not challenge the accuracy of the first weakness noted by the TEP. Plaintiff's only contention regarding the second weakness is that the FDIC must have relied on past performance information to discover this weakness, because "[s]uch a conclusion could not be drawn from Office Depot's proposal." Pl.'s Mot. at 29. In essence, plaintiff is contending that this weakness could not rationally be found in its Electronic Ordering proposal. The court disagrees.

The court reviewed portions of Office Depot's proposal that might correspond with the solicitation's requirement for an Electronic Ordering description. AR at 765–69 ("Website Ordering," "eCommerce," "Electronic Data Interchange," "Internet Web Site," "Our Electronic Commerce Leadership and Experience," and "Top Rated Internet"). These sections of Office Depot's proposal

18. Plaintiff suggests that deducting points twice, under separate evaluation factors, for the same toner recycling weakness is impermissible. Pl.'s Reply at 27–28 & n. 32. As the Government Accountability Office has stated, however, "the fact that the agency deducted points for [a proposal] weakness under multiple subfactors ... is not by itself improper." *InnovaTech, Inc.,* B–402415, 2010 CPD ¶ 94, 2010 WL 1633382, at *4 & n. 7 (Comp.Gen. Apr.8, 2010) (citations omitted). The general rule is that "an agency is not precluded from considering an element of a proposal under more than one evaluation criterion where the element is relevant and reasonably related to each criterion under which it is consid-

ered." *Id.* Here, toner recycling is "relevant and reasonably related to" to Statutory Compliance and to Supplies and Equipment. *See* AR at 109 (requiring contractor to "make available both new ... toner cartridges and remanufactured toner cartridges"), 111 (describing the recycling requirements of "Green Procurement initiatives"), 166 (stating that compliance with "FDIC Green Procurement Directives" is part of Statutory Compliance). If, indeed, the TEP counted toner recycling as a weakness in both Office Depot's Supplies and Equipment section and in its Statutory Compliance section, this would not have been improper.

may discuss technical support for Electronic Ordering in some indirect fashion, but the level of technical support offered is not immediately evident.[19] The FDIC could rationally question the adequacy of the technical support offered by Office Depot for Electronic Ordering.

Furthermore, the technical support weakness can be traced to a specific concern of the TEP. The solicitation's statement of work for Electronic Ordering requires that the contractor

> [a]llow FDIC authorized users to place orders on-line, track and monitor orders by FDIC location and program area, access and run reports in an electronic format, and *administer adding and removing users and approvers.*

AR at 110 (emphasis added). One of the individual TEP evaluators noted this weakness in Office Depot's Electronic Ordering description:

> [ ].

AR at 2962. This TEP evaluator, when reviewing Office Depot's proposal, was not convinced that adequate technical support was offered for the administration of user profiles, so that the FDIC could itself add, modify or delete data permitting its employees to electronically order office supplies, or electronically approve such orders. Although Office Depot's Electronic Ordering proposal describes the powers of "approved management 'super users,'" technical support for these "super users" is not specified.[20] AR at 768. Thus, the court finds nothing irrational, improper, arbitrary or capricious in the technical support weakness identified by the TEP, or in Office Depot's Electronic Ordering rating.

### 3. Delivery Network—[ ] of 20 Points

■ The weaknesses in this area were also instrumental in the decision not to award to Office Depot. AR at 197. The TEP stated that:

> [ ].

AR at 182. Plaintiff disputes the first weakness as inaccurate, and apparently considers the second to be either inaccurate or inconsequential. Pl.'s Mot. at 17–18 & nn. 8–9. Plaintiff insists that a score of [ ] out of 20 points for the Delivery Network section of Office Depot's mission capability proposal was not justified. *Id.* at 18 n. 9.

Each proposal submitted in response to the solicitation was to include a "delivery plan," and timeliness of delivery was one of the important considerations to be addressed. AR at 166. In the solicitation's statement of work were specific instructions regarding delivery to FDIC facilities, including restrictions on elevator use, loading dock access and parking. AR at 109–10. Contractors also are required by the solicitation's terms to give ten days notice before a change in delivery personnel affects an FDIC facility. AR at 108.

The court has reviewed Office Depot's Delivery Network proposal, which relies upon [ ].[21] AR at 769–70. The individual TEP evaluators expressed concerns about [ ]. AR at 2707, 2771, 2835, 2899, 2963. One evaluator had concerns about Office Depot's [ ]. AR at 2838. Two evaluators noted that Office Depot indicated that for some FDIC locations, Office Depot would [ ]. AR at 2707, 2771; *see also* AR at 787–88 (showing that [ ]).

Plaintiff asserts that the monitoring techniques Office Depot proposed to ensure timely deliveries to FDIC locations contradicted

---

19. These sections of the proposal did not appear to the court to be especially well-tailored to the requirements of the FDIC: "Offeror shall describe its ability to provide an efficient electronic ordering system that meets FDIC's requirements for connectivity. This will include but is not limited to multiple approval levels, designation and modification of authorized personnel, ordering, tracking, reporting and monitoring." AR at 166. The reader of Office Depot's proposal must search through repetitive and rephrased descriptions of a variety of ordering systems to discern

the Electronic Ordering process that is being offered by Office Depot to the FDIC.

20. Staples, on the other hand, specifically addressed the topic "Add and Remove Users" in its Electronic Ordering proposal, and described its "[ ]." AR at 271–72.

21. Staples proposed [ ]. AR at 273–74. Both Staples and Office Depot provided delivery information for each FDIC location. AR at 294–97, 787–88.

the weakness the TEP assigned to Office Depot's [ ]. Pl.'s Mot. at 17. The evaluators, however, rationally evaluated the delivery plan as a whole and concluded that the weaknesses noted by the individual raters and in the TEP consensus report were serious enough to lower Office Depot's score in this area. Although the court might not have arrived at the same evaluation score for Office Depot's proposed Delivery Network, the court, as it must, affords deference to the rational concerns expressed by the TEP. The court therefore finds nothing irrational, improper, arbitrary or capricious in Office Depot's Delivery Network rating.

### 4. Key Personnel—[ ] of 15 Points

 Plaintiff's final substantive challenge to the evaluation of Office Depot's mission capability asserts that the FDIC erroneously rated the Key Personnel section of the proposal. Pl.'s Mot. at 16; Pl.'s Reply at 25–27. Defendant and Intervenor agree that a Key Personnel "weakness" noted by the TEP is erroneous. Def.'s Mot. at 19; Staples' Mot. at 14. Because the parties and the court agree that this noted weakness is erroneous, the only question is whether this "weakness" is a mere typographical error which had no effect on the score given Office Depot for Key Personnel, or, as plaintiff argues, this erroneous weakness contributed to an incorrect Key Personnel score for Office Depot. As a threshold matter, the court notes that Office Depot's rating for Key Personnel was the [ ] among offerors, [ ], and was not specifically mentioned in the SRR as a reason justifying the award to Staples.

The TEP's consensus rating for Office Depot's Key Personnel is reproduced here in its entirety:

[ ].

AR at 183.

The court has reviewed the TEP report, and believes the erroneous Key Personnel weakness mentioned in the TEP report to be a cut-and-paste error. The erroneous regional office project supervisors weakness directly contradicts a strength for Office Depot in this proposal component. AR at 183. Of the fifty-six consensus ratings produced by the TEP for various mission capability evalu-

ation criteria, Office Depot's Key Personnel rating is the only one with a final sentence (weakness or strength) separated from the other weaknesses or strengths by a blank line. See AR at 174–190. In addition, the Key Personnel rating for another offeror, [ ], listed immediately before Office Depot in the report, contains a single line which is exactly the same as the "weakness" identified for Office Depot: [ ]. AR at 181.

The court also reviewed individual evaluator ratings for any trace of this "weakness" in Office Depot's evaluation. None of the individual evaluators mentioned a weakness regarding regional project supervisors information when reviewing Office Depot's Key Personnel section, or other sections of Office Depot's proposal. See AR at 2705–11, 2769–75, 2833–39, 2897–2903, 2961–67.[ ], on the other hand, was noted to have a weakness in Key Personnel concerning local project supervisor information. See AR at 2703 ("Local Proj. Supervisors + alternates to be provided"), 2767 ("Local Project Supervisors are not listed"), 2831 ("[not] specifically list contacts for RO [Regional Offices]"), 2895 ("vague info on specifics of project supervisors"). On this record, the court concludes that the inclusion of a "weakness" for Office Depot's regional project supervisor information was an inadvertent scrivener's error.

Furthermore, the court has carefully considered the parties' arguments regarding the scoring of Office Depot's Key Personnel section, and concludes that the erroneous "weakness" was not reflected in the high score Office Depot received for this criterion. The individual evaluator scores, none of which mentioned this weakness for Office Depot's Key Personnel section, were [ ], which average exactly to [ ]. AR at 2711, 2775, 2839, 2903, 2967. The consensus rating of [ ] reflects the strengths and weaknesses noted by the individual evaluators, and does not reflect the additional, erroneous "weakness" that was present in the TEP report. Similarly, the SRR carries forth the [ ] Key Personnel score for Office Depot, and does not reflect the erroneous "weakness" found in the TEP report. For these reasons, the court finds that the TEP made a *de minimis* error in its evaluation report which was not

reflected in and does not invalidate the FDIC's evaluation of Office Depot's mission capability proposal.[22]

### 5. Other Alleged Evaluation Errors

■ Plaintiff complains that one evaluator changed her ratings of Office Depot's proposal components. Pl.'s Mot. at 19 (citing AR at 2833–40). Plaintiff points to no regulation or procedure that was violated by these rating changes, or to any authority prohibiting such changes. The court does not find an individual evaluator's adjustments of her ratings in the course of evaluating several proposals to be arbitrary or capricious, or irrational.

■ In addition, plaintiff argues that Staples' Key Personnel ranking did not include an obvious weakness in regional project supervisor information. Pl.'s Mot. at 20–21. The court agrees that the TEP's consensus rating does not include a[ ], *compare* AR at 176 *with id.* at 2719, and that Staples' [ ], AR at 282–85. The court does not agree, however, that the omission [ ] from the consensus rating by the TEP is more than a *de minimis* error. On this record, considering the strengths of Staples' Key Personnel plan noted by the TEP, the court believes that Staples' [ ] score for Key Personnel is a reasonable evaluation score, when Staples' Key Personnel proposal section is compared to Office Depot's Key Personnel offering and when Staples' Key Personnel proposal section is judged as a whole. The court finds nothing in the evaluation of Staples' mission capability proposal to be irrational, improper, arbitrary or capricious.

Finally, plaintiff argues that the TEP indulged in an improper consideration of past performance, in contravention of the FDIC's elimination of past performance as an evaluation factor in the solicitation. Pl.'s Mot. at 28–30; Pl.'s Reply at 5–10. Plaintiff bases this charge on a comparison of the text of the consensus rating summaries in the TEP re-port, AR at 191–92, with a table in the FDIC manual which sets forth "Past Performance Confidence Assessment Rating[s]," AR at 1996. This argument is not persuasive.

■ The court notes first that there is no evidence that the TEP collected past performance information on the offerors, either formally or informally. The court also finds that the TEP's consensus rating summaries roughly reflect the adjectival ratings for mission capability achieved by offerors, which is an important aspect of the TEP's consensus evaluation of mission capability. The adjectival ratings, for example, discuss an offeror's "chances for success," which is rephrased in the consensus rating summaries as confidence or doubt regarding successful performance of the contract. *Compare* AR at 169 *with id.* at 191–92. The TEP report may have borrowed certain turns of phrase from FDIC past performance evaluations, but there is no indication that the consensus rating summaries relied upon past performance reviews of the offerors. To the extent that the TEP discussed the experience and proposals of the offerors in a confusing way in these summaries, such an error is *de minimis* because the FDIC did not rely on such statements for the award decision described in the SRR. AR at 196–97. For these reasons, the court does not find that the TEP evaluated the offerors' past performance, or that the FDIC's award decision relied upon an evaluation of past performance.

## VI. Staples' Core Items Price Schedules

### A. Solicitation Core Items Identification and Offeror Questions

The original solicitation contained a core items list with product descriptions such as "Moistener, Envelope" and "Scissors Heavy Duty." AR at 51–54. Before the deadline for the submission of questions, offerors asked

---

**22.** Even if the erroneous "weakness" had been reflected in Office Depot's Key Personnel score, the effect of this error on Office Depot's Key Personnel score would have been marginal. Other weaknesses were noted in this category, and only [ ] points were potentially available to add to Office Depot's [ ] score. No prejudice to Office Depot can be attributed to this error, because such a minor improvement in Office Depot's mission capability rating would not have raised Office Depot's proposal into a higher adjectival rating, and would not have produced, on this record, a different best value determination.

for more detailed product information. *See, e.g.,* AR at 2534 (from Staples) ("Is it possible for you to provide the product codes for the core list of 157 items, at least manufacturer numbers?"), 2538 (from Office Depot) ("I have been asked to provide manufacturing numbers for the items. Currently just descriptions are listed. Can you provide?"); 2543 (from Office Max) ("Would you be able to provide the bidding vendors with specific product codes for your core list items? This may help with cross referencing and standardization of items."). The FDIC responded to these questions by stating: "Yes, the solicitation will be modified to include the product codes. A revised ... spreadsheet, which includes the product codes, will be posted as well." [23] AR at 2549. The revised core list product information issued by the FDIC again gave a succinct product description, such as "Moistener, Envelope" and "Scissors Heavy Duty," but now included a vendor, such as "Quality Park" or "Office Depot," and a product code, such as "QUA46065" or "350872297," for the items on the core items list. AR at 132–34.

The instructions for the core items price schedule to be included in each offeror's price proposal state in relevant part that:

> The ... FDIC Core Items List consists of a list of 157 commonly ordered items. For each item on the list, the offeror must enter the vendor name, TAA compliance, Ability One product, base period price, extension price and total. [ [24]]

AR at 94. The instructions did not change when the FDIC provided specific vendor information and product codes for the core items in the amended solicitation. *Compare* AR at 13 *with id.* at 94. As an initial observation, the court notes that the instructions ask each offeror to specify a vendor for each core item offered, which would be a superfluous command if offerors were required to provide exactly the same item, produced by the same vendor, as the item on the FDIC's core items list, which itself identified a ven-

dor for each item. The court also notes that there is no guidance provided in the solicitation with respect to the FDIC's consideration of "brand name" or "equivalent" items in an offeror's price schedule.

Two offerors submitted questions or comments, after the deadline for questions, regarding the core items list in the solicitation. Office Depot noticed "some discrepancies" in the core items list, such as erroneous units of measure, descriptions not matching product codes, and item duplications, and asked if it would be acceptable to "respond[ ] with the most accurate part numbers for these products that we have at this time." AR at 2552–55, 2562. The FDIC agreed that this was acceptable. AR at 2561. Staples asked a more far-reaching question:

> [T]here are numerous items on the core list that we can bid at a lower cost. These items are not the name brand item requested on the solicitation. For example you have Hammer Mill paper on the core list but we have a Staples brand copy paper that is much lower cost and meets all the specifications of the Hammer Mill paper.
>
> Will you allow us to bid these alternatives that save money but are not the name brand items identified in the solicitation? Please let me know as soon as possible.

AR at 2564. No response to this question is present in the record. Staples submitted two core items price schedules, and distinguished the second schedule by using the term "With Alternates." AR at 308, 310, 315–17. The court will refer to this second list as Staples' alternative core items price schedule.

**B. Was Staples' Price Proposal Responsive to the Solicitation?**

 Plaintiff insists that "[i]t was improper and unfair for FDIC to allow only Staples to depart from the RFP's requirements for core items." Pl.'s Mot. at 14. Plaintiff contends that "[t]he FDIC's acceptance ... of two proposals by Staples was

---

**23.** The FDIC did not, however, respond to one of Office Depot's suggestions submitted at this time. Office Depot requested that dated items such as calendars and monthly planners be taken off the core items list because they "are seasonal items

and the manufacturer numbers will most likely change from year to year." AR at 2558.

**24.** TAA compliance and Ability One products will be discussed in detail *infra* at notes 28–29.

inconsistent with the Solicitation. . . ." Pl.'s Reply at 15. The court disagrees. First, as noted above, the solicitation did not require offerors to match their core items to the vendors and product codes used to identify the core items on the FDIC list, and cannot be reasonably read to include such a requirement. Second, the core items list in the solicitation listed "Office Depot" as the vendor for approximately twenty-five percent of the items. AR at 132–34. It would be irrational for offerors to assume from the solicitation that only Office Depot brand products would be acceptable to the FDIC, when all of the offerors, except Office Depot, would be competitors of Office Depot. A far more reasonable interpretation of the solicitation is that vendor and product code data were provided to assist the offerors in identifying equivalent products, so that the offerors' price schedules would offer the identified products commonly ordered by the FDIC.[25]

Furthermore, notwithstanding plaintiff's arguments to the contrary, every core items price schedule in the record before the court evidences the offerors' understanding that the substitution of equivalent products for those identified in the solicitation was acceptable, and that substitution was not limited to the items that identified "Office Depot" as the vendor. Office Depot included at least [ ] substituted products in its own core items price schedule. AR at 956–59, 963. Another offeror, [ ], substituted vendors for several items. AR at 2601–03. Both of Staples' core items price schedules contain equivalent products from other vendors, although its alternative price schedule contains more substitutions, and offers Staples brand items in some instances in lieu of a brand name product such as a Hewlett Packard toner cartridge. AR at 312–17.

As to Office Depot's claim that its substitutions were somehow of a different character than Staples' substitutions, the distinctions do not appear to the court to be significant, at least in terms of the solicitation's requirements. Office Depot substituted equivalent pens, for example. See AR at 963 (for item seven, changing from a[ ] ). Office Depot changed vendors for several products. See id. If these substitutions were indeed forbidden by the solicitation, as plaintiff alleges, Office Depot received the same improper treatment as Staples and other offerors when the FDIC accepted their price proposals. Office Depot was thus not prejudiced by the error it alleges, and cannot succeed on this ground of its protest. See Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1380 (Fed.Cir.2009) (stating that a protestor must show that the alleged procurement error caused it "to suffer disparate treatment or particularized harm").

The court finds that the solicitation did not require that the offerors' core items price schedules match the vendor and product codes set forth in the solicitation. Thus, the FDIC was free to consider, as it did, price schedules that included equivalent items. The court also finds that equivalent items in the offerors' core items price schedules, whether these were presented in two alternative schedules, or within one schedule, were responsive to the solicitation. As this court has explained:

> "In the rubric of procurement, an alternate bid is one which offers to supply something other than what an [invitation for bids] requires as an alternative method of meeting the Government's needs. Such bids are non-responsive. On the other hand, a bid might offer several alternative responsive items at different prices, the lowest of which can properly be considered."

*Group Seven Assocs., LLC v. United States,* 68 Fed.Cl. 28, 32–33 (2005) (quoting *Essex Electro Eng'rs, Inc. v. United States,* 3 Cl.Ct. 277, 282 n. 6 (1983)). Thus, the FDIC was free to choose items from either of Staples' core items price schedules.[26]

---

**25.** Staples was not confident, apparently, that ` Staples products could be substituted for brand name products, *see* AR at 2564, and tried to receive assurance from the FDIC in this regard. There is no evidence that the FDIC provided that assurance, and the submission of two price lists indicates that Staples did not place all of its hopes for award on its alternative core items price schedule.

**26.** Even if some of the items on Staples' alternative core items price schedule were not satisfactory equivalents of the core items identified in the solicitation, Staples' proposal would still

## C. Averaging the Price of Staples' Core Items Price Schedules

 Plaintiff's final argument against the FDIC's evaluation of Staples' core items price schedules is that it was irrational for the FDIC to have averaged the total price of the two price schedules. Pl.'s Mot. at 14; *see also* Pl.'s Reply at 15 (stating that the "hybrid evaluation of two proposals by Staples was inconsistent with the Solicitation"). The court does not find that the averaging of Staples' two core items price schedules was inconsistent with the solicitation, particularly when such averaging afforded the FDIC the greatest range of product choice and price. The calculation of "Total Evaluated Price" set forth in the solicitation, AR at 94, requires a "Total 5-Year FDIC Core Items Price," which, in Staples case, could have been a total derived from either of its core items price schedules, or from some combination of the two schedules. The FDIC rationally chose to average the sums of Staples' two core items price schedules to represent the most accurate figure for the core items that Staples was offering to the FDIC. Indeed, the awarded contract contains a price schedule that is fully consistent with the FDIC's averaging of Staples' two price schedules—both brand name and Staples brand items were included in the contract and reflect that items were selected from both of Staples' core items price schedules. *See* AR at 1733–36. For these reasons, the court finds nothing in the evaluation of Staples' core items price schedules to be irrational, improper, arbitrary or capricious.

## VII. Communications with Offerors

Plaintiff asserts that communications between the FDIC and Staples violated the scope of acceptable proposal clarifications, and in fact constituted discussions which impermissibly allowed Staples to modify its proposal. Pl.'s Reply at 19–20. Plaintiff further contends that the FDIC, because it conducted discussions with Staples, should have conducted discussions with Office Depot. *Id.* at 21. The communications between the FDIC and Staples were, in fact, extensive and require a similarly extensive examination by this court.

## A. Clarifications vs. Discussions

The FDIC manual sets forth the procedures governing communications with offerors in formal contracting. *See* AR Tab 15. One overarching principle is that "FDIC personnel involved in any acquisition must not engage in conduct that[ ] ... [f]avors one offeror over another." AR at 2001. There are two types of permissible communications with offerors: "The Contracting Officer communicates with offerors through two different levels of exchange, clarifications and discussions. The level of exchange is determined by the degree of interaction necessary for the Contracting Officer to make the award." AR at 1998.

The definition of clarifications used by the FDIC is reproduced here in its entirety:

> Clarifications are limited exchanges between FDIC and offerors that do not result in a change to the offeror's proposal or price. Rather, a clarification simply explains an area of a proposal that is ambiguous, for example, conflicting statements in the proposal; or is otherwise unclear, such as a clerical error. In this level of exchange, the Contracting Officer requests in writing that the offeror(s) clarify certain aspects of proposals or resolve minor or clerical errors.

> During the evaluation process, if TEP members need clarification on any part of a proposal, the TEP Chairperson may request it from the Contracting Officer. Only the Contracting Officer has the authority to request clarification from an offeror, and the Contracting Officer must

---

have been responsive to the solicitation. As this court has stated:

> If only one of the two [proposed items] is responsive, then the bid is itself responsive. . . . [S]ome items offered [may be] alternates and can be rejected without creating an ambiguity as to the bidder's intent to be bound by the [solicitation] through other responsive

items. . . . Assuming that either of [the offeror's items] was nonresponsive, the [government] in this case had the option of accepting the responsive [item] and striking the nonresponsive item, thereby binding [the offeror] to supply a responsive [item].

*Essex Electro*, 3 Cl.Ct. at 282 n. 6 (citation omitted).

request clarification in writing. Contracting Officers must instruct the offeror to provide supplemental information of a strictly explanatory nature. An offeror must provide the clarification in writing, but may not change any part of the proposal as a result of the clarification request. If the offeror provides information that changes the contents of its proposal, the Contracting Officer can disregard the changes, eliminate the proposal from further consideration, or waive the matter as a minor informality, if that is the case. All clarifications must be documented in the official contract file.

AR at 1999.

Discussions, on the other hand, are more extensive communications and serve different purposes than clarifications. The FDIC definition of discussions is reproduced here in its entirety:

Following the initial evaluation of the proposal, if there is no one successful offeror, the Contracting Officer must determine which offerors are within the competitive range. Technical and/or price discussions must be held with each offeror in the competitive range. Discussions are negotiations between the offeror and FDIC. The discussions enhance FDIC understanding of the proposal, allow reasonable interpretation of the proposal, and facilitate the evaluation process.

Discussions are tailored to each offeror's proposal, and must be conducted by the Contracting Officer. The primary objective of discussions is to maximize the ability of FDIC to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation.

Before holding discussions, the Contracting Officer normally meets with members of the TEP to review the findings. During this meeting, the Contracting Officer must determine what information to provide to, and request from, offerors in the competitive range concerning their proposals.

With the assistance and participation of the TEP, the Contracting Officer conducts the discussions, face-to-face, telephonically, or in writing, and may include technical, price, or other issues. The Contracting Officer must control the discussions to ensure they are conducted fairly. Discussions are not a general question-and-answer period for each offeror; rather, the Contracting Officer must ask specific questions to clarify uncertainties in the proposal.

During discussions, the Contracting Officer must:

(1) Advise the offeror of deficiencies in its proposal based upon the TEP's evaluations;

(2) Attempt to resolve any uncertainties concerning the offeror's proposal;

(3) Identify and resolve suspected mistakes by calling them to the offeror's attention without disclosing information on other offerors' proposals or the evaluation process;

(4) As appropriate, inform an offeror that FDIC considers its price to be too high, or too low; and,

(5) Discuss adverse past performance information to which the offeror has not previously had an opportunity to comment.

During discussions the Contracting Officer must ensure that FDIC personnel do not:

(1) Help an offeror bring up a proposal to the level of other proposals through successive discussion opportunities (see *Limits on Communications* at PGI 3.211(c) below);

(2) Indicate to an offeror that a price must be met to obtain further consideration; or

(3) Furnish information about other offerors' proposed prices.

After discussions are completed, offerors are given the opportunity to revise or clarify their proposals through submission of a best and final offer (BAFO).

AR at 2000–01.

With these definitions in mind, the court turns to the communications between Staples and the FDIC, to determine whether the FDIC's procurement procedures were violated in each instance.

**B. Communications between the FDIC and Staples**

As a preliminary matter, the FDIC manual does not require that clarifications, once initiated, must be obtained from all offerors, or that clarifications must be equal. Thus, plaintiff's argument that the FDIC should not have obtained clarifications from Staples without obtaining clarifications from Office Depot is not grounded in FDIC acquisition procedures. *See* Pl.'s Mot. at 24, 27 (decrying unequal treatment and disparities in the opportunities for clarification provided the offerors). Plaintiff must show, instead, that when the FDIC obtained clarifications from Staples, this agency action favored Staples over other offerors.

The FDIC manual does state, however, that clarifications must be requested in writing, and must be requested by the contracting officer. AR at 1999. As plaintiff points out, all of the clarifications at issue here were requested by Mr. Curtis Courtney, senior contract specialist, not Mr. Steven West, the contracting officer, and two of the clarifications from Staples were requested by telephone. Pl.'s Mot. at 24, 27; *see also* AR at 2571 (showing two clarifications that are unsupported by email communications in the record and which appear to have been requested by telephone). The court notes that the solicitation contains a statement that ("[t]he term 'Contracting Officer' ... includes, except as otherwise provided in this Contract, the authorized representative of the Contracting Officer acting within the limits of his authority"). AR at 105.

 In seeking clarifications of Staples' proposal, Mr. Courtney presented himself as "working with" Mr. West, the contracting officer, and the court has no reason to doubt that his actions were authorized by the contracting officer. AR at 2569. When the solicitation and the FDIC manual are read together, the court does not find that a clear violation of the FDIC manual occurred when Mr. Courtney, not Mr. West, contacted Staples for clarifications.[27] And although telephoned requests for clarifications are pro-

scribed by the FDIC manual, in this case the error was not significant because the record documents the clarifications in question and permits effective agency and judicial review. The court now turns to the particular communications between Mr. Courtney and Staples that have been challenged as improper, to determine whether these were, pursuant to the definitions provided in the FDIC manual, clarifications or discussions.

**1. Staples' Alternative Core Items Price Schedule**

 Mr. Courtney asked Staples to define how its alternative core items price schedule responded to the solicitation's requirements:

> [Your] core pricing also gives an[ ] option of "alternate" pricing. What exactly is the alternate pricing (i.e., certain products, which products do they replace, how are the alternate items different from what was required, etc.). We can not consider the alternate pricing without more detail.

AR at 2569. Staples responded that it was "offering FDIC alternate products on the second spread sheet that meet the specifications of the original item and will perform up to the standard of the original item." AR at 2571. The court finds that this is a clarification which "simply explains an area of a proposal that is ambiguous" and which did not change Staples' proposal. AR at 1999. This clarification was permissible and proper.

**2. Staples' Use of Subcontractors**

 Mr. Courtney asked Staples to clear up conflicting information concerning its use of subcontractors:

> On page 25 of your tech proposal, you indicate there will be subcontracting to various small businesses, etc. However, in the standard language of the reps and certs further back in the proposal, you have checked there will be no subcontracting opportunities.

AR at 2568. Staples responded that:

> Subcontracting information on Page 25. Staples employ[s] the use of sub contrac-

---

27. To the extent that a contracting specialist's requests for clarifications could be viewed as a violation of the FDIC manual, such a violation of procedure, in the context of this procurement, would be *de minimis* and immaterial.

tors in performance of our everyday business activities. For example, the Custodial Service for the Sales Offices and Distribution Center. We also buy products from sub contracts to use in our business whenever possible. However, Staples does not plan to use a Sub Contractor in the execution of the FDIC Solicitation. This solicitation will be managed by Staples personnel in Washington DC and around the country.

AR at 2571. This is a permissible clarification which reconciles "conflicting statements in the proposal" and is in accordance with FDIC acquisition procedures. AR at 1999.

### 3. Staples' Ability One Designations

■ The core items price schedule in the solicitation included a column for Y/N entries stating whether or not each product offered was an "Ability One Product." [28] AR at 94–98. All of the entries in the Ability One column within Staples' core item price schedules were either "No," "ETS," or "A–List." AR at 312–17. Mr. Courtney, according to Staples' email, asked whether "ETS in the Ability One column mean[s] Yes or No that the item is an Ability One item," and whether "A–List in the Ability One column mean[s] Yes or No that the item is an Ability One item." AR at 2571. Staples confirmed that "ETS" and "A–List" meant "Yes it is an Ability One item." *Id.* These two clarifications, the only ones solicited by telephone, clear up minor ambiguities in Staples' proposal, and are in accordance with the FDIC manual.

### 4. Staples' Financial Capability Information

■ Mr. Courtney contacted Staples on January 21, 2010, questioning whether one of the identifying numbers provided in Staples' corporate information was correct. AR at 2627. The correct information was supplied later that day. AR at 2626 (supplying a federal identification number and a "Duns" number). The next day Mr. Courtney requested "your current Dun and Bradstreet Report or financial statements that detail Staples['] current financial capability and standing." AR at 2629. That information, too, was provided the same day. AR at 2628. Plaintiff questions whether this information was a mere clarification, or whether the information provided changed Staples' proposal. Pl.'s Mot. at 26. Both defendant and intervenor persuasively argue that Mr. Courtney's request for current financial information obtained data that was used in a pre-award verification of Staples' financial capability, which is documented in the SRR. *See* Def.'s Mot. at 23; Staples' Mot. at 32; *see also* AR at 198. The court finds that this pre-award verification was neither a clarification nor a discussion, and agrees with defendant that Mr. Courtney requested information required by the FDIC manual. Def.'s Mot. at 23 (citing AR at 1970–72).

### 5. Staples' TAA Compliance Updates

■ On January 13, 2010, Mr. Courtney emailed Staples:

> I need to know which products are TAA compliant and which are not for the TBD items for each pricing proposal. If not, I will have to assume all the TBDs are non TAA compliant and be evaluated as such.

AR at 2578. In Staples' core items price schedules certain items had been marked "TBD" (presumably, to be determined) in the "TAA Compliant" column.[29] *See* AR at 312–

---

**28.** The Javits–Wagner–O'Day Act (JWOD), 41 U.S.C. §§ 46–48c (2006), "creates jobs and training opportunities for people who are blind or who have other severe disabilities." AR at 1927. The JWOD program is also known as AbilityOne, and the "FDIC is required to fill its procurement needs for items on AbilityOne's procurement lists from AbilityOne groups." *Id.*

**29.** The solicitation informed offerors that the "FDIC will evaluate offers in accordance with the policies and procedures of the Trade Agreements Act." AR at 161. The FDIC manual states that the "Trade Agreements Act (TAA) of 1979 [,

19 U.S.C. § 2501 *et seq.* (2006),] . . . is the statutory authority for many of the trade agreements to which the United States is a party." AR at 1926. The TAA rules are set forth in the solicitation, with reference to the FDIC manual. AR at 143, 160–61, 2381–85. Contractors were required to identify all products offered as either TAA compliant (made in the United States or in a country qualifying as a "designated country") or TAA non-compliant (made in some other country). AR at 94–98, 160–61, 2383–84. The solicitation informed offerors that "[t]he Government will consider for award only offers of U.S-made

17. Staples responded on January 14, 2010 that

[a]t this time we are not in position to certify that the items in question are TAA compliant based on the information that we have. We are working with the manufacturing community to obtain that certification. We would agree that without that certification that you should consider these items non-compliant for your analysis.

Please consider that all of the distributors competing to support your business should be offering the same products that are manufactured in the same countries.

AR at 2573.

On January 15, 2010, Mr. Courtney emailed three other offerors to request clarification of the "TAA Compliant" data entries in their price schedules. AR at 2580–86. Mr. Courtney attached to these emails a letter requesting country of origin data for all items on the offerors' core items price schedules, whether these items had been listed as TAA compliant or TAA non-compliant. AR at 2583. Responses from offerors were due on January 21, 2010.[30] Id. Responses to these emails appear to have been received by January 21, 2010. AR at 2587–90, 2601–03, 2611–16.

During this time Staples provided two updates to its TAA "TBD" items, on January 19 and 21, 2010. AR at 2593, 2623. Apparently, Staples' TAA information provided in these updates permitted confusion as to how the TAA compliance data applied to Staples' two core items price schedules. On January 27, 2010, Mr. Courtney emailed Staples asking that the TAA compliance information previously submitted be annotated to clearly indicate the TAA compliance information for both lists: "Please review the attached document and correct with green or red squares for TAA compliance. With your clarification, you did not indicate if each was compliant as the core, or the alternate core." AR at 2605. Staples provided the requested information later that day. AR at 2604. It appears that

Staples made twenty-one changes to the TAA compliance data in its two price schedules on January 27, 2010. Id.

### a. Staples' TAA Updates Did Not Affect its Mission Capability Score

Staples received a high score for Statutory Compliance, for which the solicitation required each offeror to "describe its plan to manage supplies and products [to] comply with specific statutes such as the Trade Agreements Act, Javits–Wagner[–]O'Day Act and FDIC Green Procurement Directives." AR at 166, 175. The TEP commented that Staples "is compliant with TAA, collecting the Country of Origin dat[a] on all items in their catalog," a comment which is fully supported by Staples' mission capability proposal. AR at 175, 275, 319–682. The price proposal, including the core items price schedules, was submitted in a separate volume and was not considered by the TEP as part of its evaluation of Statutory Compliance and mission capability. AR at 192. Thus, the record cannot be read to show that the TAA compliance communications between Mr. Courtney and Staples were in any way at issue in the rating of Staples' Statutory Compliance and mission capability.

### b. Staples' TAA Updates Were Proper Clarifications

The court finds that the TAA updates provided by Staples resolved an ambiguity in its price proposal, and were thus within the definition of clarifications provided by the FDIC manual. As intervenor-defendant points out, no changes were made to the products offered by Staples, or the prices quoted in Staples' price schedules. Staples' Reply at 9; see AR at 2593, 2604–09, 2623 (not indicating that any changes to Staples' core items price schedules were made, other than changes to the entries in the TAA compliance column). As another offeror responded to Mr. Courtney when providing TAA compliance updates, ("[p]lease accept

---

or designated country end products unless the Contracting Officer determines that there are no offers for such products or that the offers for those products are insufficient to fulfill the requirements of this solicitation." AR at 161.

**30.** Both the letter itself and the deadline were erroneously dated "2009."

our sincere apologies[;] there was a clerical error when identifying some of the items. All pricing will remain the same as initially submitted."). AR at 2611. The court also notes that the FDIC considered these TAA updates to be clarifications, and the agency's characterization of such communications is typically accorded some deference when not clearly erroneous. *See ITAC*, 316 F.3d at 1323 (stating that "we give deference to an agency's permissible interpretation of its own [acquisition] regulations" (citing *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 218–19, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001); *Am. Express Co. v. United States*, 262 F.3d 1376, 1382 (Fed.Cir.2001))).

The court also finds that the TAA clarifications did not improperly favor Staples over the other three offerors from whom clarifications were requested. The clarifications requested have not been shown to advantage Staples over these other offerors. Country of origin data were required by the solicitation. AR at 160. Mr. Courtney sought relevant data from all four of these offerors that would assist in his review of price proposals. The FDIC manual does not require that clarifications be identical, or perfectly contemporaneous.

As to Office Depot's assertion that the clarification opportunities afforded Staples favored Staples over Office Depot, the court disagrees. The clarifications requested from Staples were tailored to Staples' proposal, and similar clarifications were not required to resolve ambiguities in Office Depot's proposal.[31] The court finds no significant procurement error in the TAA compliance clari-

fications solicited from Staples and received by Mr. Courtney.

#### c. Staples' TAA Updates Were Not Discussions

Even if Staples' TAA compliance updates strained the bounds of the FDIC's definition of clarifications, they fell far short of the FDIC's definition of discussions. Discussions, according to the FDIC manual, are only triggered by a competitive range determination, and involve negotiations with all offerors in that competitive range. AR at 2000. Here, there is no evidence that a competitive range determination was made, or that negotiations between the FDIC and Staples were initiated by Mr. Courtney. The FDIC, when it reviewed Office Depot's unsuccessful protest of the contracting officer's award to Staples, found that no discussions were necessary after the proposals had been evaluated, and concluded that discussions had not occurred.[32] *See* AR at 262. The court agrees that the TAA compliance updates provided by Staples were not discussions, and defers to the FDIC's permissible interpretation of its procurement procedures. *ITAC*, 316 F.3d at 1323.

#### d. Even if Staples' TAA Updates Could Be Considered to Constitute Discussions, Office Depot Was Not Prejudiced

Finally, Office Depot cannot show prejudice from the TAA compliance updates solicited from Staples. It is certainly true that the TAA compliance entries from the price schedules of three offerors were compiled in

---

**31.** Staples was asked to clarify ambiguous information concerning the TAA compliance of certain core items. As intervenor-defendant points out, these clarifications did not address Staples' mission capability weaknesses. Staples' Mot. at 30. When plaintiff suggests that Office Depot should have been given an opportunity to correct weaknesses in its proposal, Pl.'s Mot. at 24, plaintiff requests an opportunity not provided Staples.

**32.** Plaintiff argues that if discussions were held with Staples, Office Depot was entitled to discussions, too. *See* Pl.'s Reply at 21 ("Once having conducted discussions with Staples, the FDIC was required to hold discussions with all offerors.") (citations omitted). The FDIC manual

states that "[f]ollowing the initial evaluation of the proposal[s], if there is no one successful offeror ... discussions must be held with each offeror in the competitive range." AR at 2000. The FDIC's Associate Director of the Acquisitions Services Branch reviewed this procurement and found that "evaluation resulted in a sufficient number of highly rated proposals" to permit award, and, thus, "discussions with offerors regarding the merits of their technical proposals were not deemed necessary." AR at 262. The court defers to the FDIC's permissible interpretation of its procurement procedures, and concludes that the conditions requiring discussions to be held with all offerors in a competitive range were not met here.

a comparative chart. *See* AR at 2617–20 (showing, in a chart marked "TAA Compliance," the compliant or non-compliant status of each of the 157 core items, for Office Max, Staples, and Office Depot). The chart indicates that Office Max offered [ ] non-compliant items, Staples offered [ ] non-compliant items, and Office Depot offered [ ] noncompliant items.[33] AR at 2617. The chart apparently reflects the updated TAA compliance information Mr. Courtney obtained from Staples. *Compare* AR at 312–17 *with id.* at 2617–20.

A comparative evaluation of the TAA compliance of items on the core items price schedules of offerors is not explicitly referenced in the solicitation. The court understands that such an evaluation would be included in the rubric of "total price and other price factors," which was identified as being the "most significant factor" in a best value determination, when equally matched technical proposals were being considered for award. AR at 168. Thus, a comparative evaluation of the TAA compliance data entered on core items price schedules was not considered until the FDIC compared the proposals of Staples and Office Max, both of which were rated "Excellent," for a "final selection":

> The proposals that offer the FDIC the greatest assurance of satisfactory performance at a reasonable price are the proposals from Staples and Office Max, both of which are rated Excellent. For those reasons, the proposal from Office Depot was not considered for award and the final selection was considered between the two Excellent rated proposals. The award to one of the Excellent rated offerors trades a slightly higher price for a much greater confidence that the FDIC will receive satisfactory performance over the life of the contract.
>
> The proposals from Staples and Office Max, were technically rated as Excellent, with Staples scoring slightly higher in overall points (95.9 vs. 92.0) and there is a high confidence both companies could perform successfully. The strengths of the

Staples proposal over the Office Max proposal were its slightly lower price, higher percentage of Trade Agreement Act compliant items, higher number of retail stores, [ ] and more highly rated customer service/quality assurance programs.

AR at 197.

Office Depot had been eliminated from consideration by the time a comparative evaluation of the TAA compliance of items on the core items price schedules of Office Max and Staples was employed as one of several discriminators between two equally, or nearly equally, rated proposals. Even if Staples had not been allowed to update its TAA compliance data for its core items, Office Depot's chances for award would have remained the same. On this record, award would still have been to Staples or Office Max, not Office Depot. Without prejudice, even if Staples was allowed to update its TAA compliance data through improper discussions, Office Depot's protest on this ground must fail.

## VIII. Best Value Weighing of Price and Mission Capability

■ Plaintiff complains that the FDIC made an irrational best value determination, trading relatively unimportant and superficial differences in mission capability proposals for a large price premium. Pl.'s Mot. at 22–23; Pl.'s Reply at 2–5. Plaintiff contends that the FDIC did not "demonstrat[e] that the difference between 'Excellent' and '[ ]' equated to sufficient monetary value." Pl.'s Reply at 4. Although plaintiff cites numerous authorities discussing deficient best value determinations, best value to the FDIC is described in the solicitation and the FDIC manual, and this description varies somewhat from similar discussions of best value in the FAR. *Compare* AR at 168, 170, 2221–22, 2235 *with* 48 C.F.R. §§ 15.101, 15.101–1, 15.308 (2009). The court therefore cautiously applies precedent regarding best value determinations to this case, which is governed by the best value clauses contained in the evaluation section of the solicitation. *See* AR at 168, 170.

---

**33.** According to plaintiff, these numbers have been adjusted to reflect only those TAA non-

compliant items that could not be waived by the contracting officer. Pl.'s Reply at 22 n. 29.

Although plaintiff argues that the FDIC did not adequately quantify the technical advantages of Staples' proposal in its best value determination, the Federal Circuit has not held specifically that "evaluators must assign a dollar amount to technical strengths in order to demonstrate best value within a reasonable certainty." *Hydro Eng'g, Inc. v. United States,* 37 Fed.Cl. 448, 468–69 (1997) (citing *Widnall v. B3H Corp.,* 75 F.3d 1577, 1584 (Fed.Cir.1996) and *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955 (Fed.Cir. 1993)). The court notes that nothing in the FDIC manual or the solicitation suggests that an itemization of technical advantages, with prices assigned to each advantage, is required in a best value determination. In this procurement, price and mission capability were equal factors, and the FDIC appropriately weighed technical advantages and price before awarding the contract to Staples. The FDIC relied not just on overall mission capability scores, but on specific criteria that were deemed "critical to satisfactory performance." AR at 197. There was adequate detail in the record to show how price and mission capability were given due consideration, to arrive at an "integrated assessment" of proposals. AR at 170, 2235. The court views the FDIC's best value award decision as rational and in accordance with the FDIC manual and the solicitation.

## CONCLUSION

Office Depot has failed to demonstrate that the FDIC's decision to award the contract to Staples was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Furthermore, no significant procedural error marred this procurement. Because Office Depot's protest has not succeeded on the merits, the court need not proceed to the question of whether Office Depot has shown that it is entitled to injunctive relief from this court. For the reasons discussed above, plaintiff's cross motion for judgment on the administrative record is denied, and defendant's and intervenor-defendant's cross motions for judgment on the administrative record are granted.

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Application for Temporary Restraining Order, filed June 1, 2010, is **DENIED;**

(2) Plaintiff's Motion for Preliminary Injunction, filed June 1, 2010, is **DENIED;**

(3) Plaintiff's Motion for Judgment on the Administrative Record, filed June 21, 2010, is **DENIED;**

(4) Defendant's and Intervenor–Defendant's Cross–Motions for Judgment on the Administrative Record, both filed June 28, 2010, are **GRANTED;**

(5) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant and intervenor-defendant, dismissing the complaint with prejudice;

(6) Per the court's sealed order of June 25, 2010, proposed redactions to that order were due by July 8, 2010. No proposed redactions were submitted to the court. **If no proposed redactions to the court's order of June 25, 2010 are received by August 13, 2010,** the court will **PUBLISH** the order of June 25, 2010 in its entirety;

(7) On or before **August 20, 2010,** counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of this opinion can then be prepared and made available in the public record of this matter; and

(8) Each party shall bear its own costs.